## HENRY J. SISSUNG v. GERTRUDE SISSUNG.

*Divorce—Fraud—Representations as to pregnancy.*

1. The decree below being affirmed by an equal division of the Court, *nothing is decided.*

2. MORSE, J., filed an affirmative opinion, concurred in by CAMPBELL, C. J., holding—

    *a*—That the fraudulent concealment by a female of her pregnancy by another person will avoid her marriage to one ignorant of this fact, and believing her chaste at the time of such marriage.

    *b*—That the rule applies to a case where the complainant had intercourse with an unmarried woman at the time pregnant by another man, which condition she afterwards charged as the result of such intercourse, and insisted upon marriage with complainant, who, believing the child to be his, and with a desire to repair as far as possible the wrong done her, yielded to her wishes and married her.

3. SHERWOOD, J., favored a reversal of the decree, for reasons stated in his opinion; CHAMPLIN, J., concurring in a reversal.

Appeal from Monroe. (Joslin, J.) Argued January 7, 1887. Decided February 15, 1887.

Bill for divorce for fraud. Decree overruling general de- murrer and remanding case for further proceedings. Affirmed by an equal division of the Court. The facts are stated in the opinion.

*George M. Landon,* for complainant.

*George Gartner,* for defendant.

MORSE, J. This is an appeal from the Monroe circuit court in chancery, from an order overruling the general de- murrer of the defendant to the bill of complaint filed in this cause. We are therefore to determine from the bill, taken as true, whether it alleges a cause of action.

The complainant shows that he intermarried with the defendant, February 10, 1886; that he resides in French- town, in the county of Monroe, and has lived in this State the requisite statutory time, and upwards, previous to the filing of this bill; that while he lived with the defendant she gave birth to a male child, born April 20, 1886, whose father is one Joseph Shoemaker, as he is informed by defendant, and verily believes;—

"That his acquaintance with said Gertrude began in the month of June, 1884, at which time she visited friends in the neighborhood of your orator's home, for about one week; that she again came to visit said friends on or about the month of January, 1885, and remained for about one month, and then left for her father's home, in said county of Wayne, as he is informed and believes; that, after her said return, your orator neither saw nor heard from her again until the latter part of November, or the first part of De-

cember, 1885, at which time she again visited her said friends for about one week, and returned home; that about six weeks after said last visit, said Gertrude requested your orator to come and see her, because she was sick since her last visit; that he went to visit her, and she informed your orator that she was pregnant by him, and insisted upon being married to him.

"Your orator further represents that, being without experience, and relying wholly on the truthfulness of said representation, and being willing to repair, so far as in his power, any wrong that he may have done, and to save the reputation and character of said Gertrude as well as his own, and intending to do as nearly right as he could in the circumstances, he married said Gertrude as aforesaid; that he took said Gertrude to his home in Frenchtown, in said county of Monroe, and that they took and occupied a house together, and lived together as husband and wife, until the birth of said child, as aforesaid, up to which time your orator had, in good faith, believed said child to be his own."

He alleges that he never had sexual intercourse with the defendant before her last visit, in the latter part of November or first part of December, 1885; that said child was full grown, and that the defendant had carried the same for the full period of gestation; that said child is not his, as falsely and fraudulently claimed by said defendant when she persuaded him to marry her; that defendant knew all the time that he was not, and could not be, the father of said child, but falsely pretended she was pregnant by him, and by so pretending induced him to marry her; that he was deceived and defrauded into said marriage, and ought not to be held as the father of said child; that he remained in the house with said defendant four days after her confinement, under the advice of a physician, and attended to her wants, for the sole purpose of seeing that she did not suffer; that, as soon as suitable help could be procured, he left, and went to his

father's house, since which time he has had no communica-
tion or intercourse with defendant.

He avers the absence of any collusion or agreement, in con-
formity to the rule; and prays for a divorce, and that the
child may be declared to be the child and heir of the defend-
ant, but not of himself, and for general relief.

It seems to be well settled that a fraudulent concealment.
by the female of her pregnancy by another person will void
her marriage to one ignorant of this fact, and believing her
chaste at the time of the marriage. If a woman is with-
child by a stranger at the time of the marriage, and her in-
tended husband is ignorant of the fact, he may have the·
marriage declared null for fraud. *Baker v. Baker,* 13 Cal..
87, 102; *Reynolds v. Reynolds,* 3 Allen, 605; *Morris v. Mor-
ris,* Wright (Ohio), 630; *Ritter v. Ritter,* 5 Blackf. 81;
*Scott v. Shufeldt,* 5 Paige, 43; *Carris v. Carris,* 24 N. J.
Eq. 516.

A woman to be marriageable, it is said, must, at the time,
be able to bear children to her husband; as the first purpose
of matrimony, by the laws of nature and society, is procrea-
tion. A woman who is pregnant at the time of marriage by
a stranger is not in a condition to bear children to her hus-
band, and the concealment of that fact, or a misrepresenta-
tion, is a gross fraud upon the husband, and sufficient to avoid
the marriage, if he was ignorant of her situation, and be-
lieved her chaste and virtuous. But most of the reported·
cases upon the subject hold that where the husband has had
intercourse with the wife before marriage, and knows that
she is pregnant, but is falsely led to believe that the child is
his, and its birth proves it not to be his, yet, nevertheless, he
must submit to the bonds of matrimony, and the presumed
paternity of the child. *Foss v. Foss,* 12 Allen, 26; *Crehore·
v. Crehore,* 97 Mass. 330; *Carris v. Carris,* 24 N. J. Eq. 517.

In 97 Mass. the court say that the husband had full knowl-
edge that the woman was unchaste before he entered into·

the marriage contract, and was thereby put on his guard, so that he cannot allege that he was induced to contract the marriage by such fraud and deceit of the defendant as will enable him to avoid his contract.

In *Scroggins v. Scroggins,* 3 Dev. 535, the petitioner was married on the eighteenth of December, 1828, and a mulatto child was born to his wife, May 1, 1829. The opinion states that he did not venture to swear that he believed her chaste at the time of his marriage, and for that reason denied his petition.

But in a later case, *Barden v. Barden,* reported in the same volume, at page 548, where the petitioner alleged that he knew at the time of the marriage that the defendant had a child, but that he thought it was his, and that she, by her artful conduct before marriage, induced him to believe that she had been modest and virtuous, except in the one instance, which she pretended was the result of her attachment for him, and that soon after marriage he discovered that the child was a mulatto, upon which he had instantly parted from her, the court, composed of the same judges who united in the opinion in the case of *Scroggins v. Scroggins,* held the petition good. In *Long v. Long,* 77 N. C. 304, the majority of the court followed the decision in *Scroggins v. Scroggins.*

In *Scott v. Shufeldt,* 5 Paige, 43, the complainant alleged in his bill that he had occasionally visited defendant, and that she afterwards made oath before a magitrate that she had been delivered of a bastard child, and that the complainant was the father of such child; that he was arrested upon the charge of bastardy, and required to give bail as the putative father of the child; that, believing it to be a white child, and being unable to procure bail, he consented to marry defendant, and did marry her; that he subsequently ascertained that the child was a negro child, the complainant and defendant being both white persons; and that he had not cohabited with the defendant subsequently to such marriage.

It was held by the chancellor that the defendant intentionally defrauded the complainant in such manner as to authorize the court to declare the marriage contract a nullity. The court remarks that,—

"If the child had not been born at the time of the marriage, the complainant would have had some difficulty in showing that he had been intentionally deceived and defrauded by the defendant, as she might possibly have supposed the child to be his, although she had also had connection with a negro about the same time."

This case sustains the bill of the complainant in this case. It authorizes the nullifying of a marriage procured by the fraud of the woman in representing to the man that she is pregnant by him, when, at the time of such representation, she knows that she is pregnant by a stranger, and not by him. And it seems to me to be consonant with equity and justice. Each case is governed more or less by its own circumstances, and, in the cases holding the contrary doctrine, a belief seems to have pervaded the courts that the complainant had been guilty of such moral wrong or statutory crime, by his intercourse with the defendant before marriage, as to preclude him from equitable relief, or that he had not shown with sufficient certainty that the child could not be his, and that the defendant knew at the time of the representations that the child was the fruit of intercourse with another.

In the case before us, as it stands upon the record, the defendant was unchaste, and pregnant by another man, when the complainant had intercourse with her. Taking advantage of this intercourse to hide her coming shame, she sends for complainant, who is young and inexperienced in the ways of the world and women, and pretends to be sick and pregnant from the result of the connection with him. She insists upon marriage. He, believing the child to be his, and the girl to have been virtuous before he met her, with the laudable desire of repairing the wrong that he supposed he had done, and to save her character and reputation, marries her.

The law looks with favor upon such action, and prosecutions for bastardy and seduction are frequently settled by marriage. If the story of complainant is true, he followed the dictates of conscience, and entered into the marriage relation with defendant from worthy motives. The betrayer of the innocent cannot be condemned for marrying his victim. The seduction is the crime to be execrated, but marriage afterwards is to some extent a reparation of the wrong; at least, it is the best amendment he can make the injured one.

The mere act of sexual intercourse between a single man and an unmarried woman is not a crime at common law, or under any statute of this State. The fault of the complainant in sinning against the moral law does not entitle him to be deceived and defrauded in this manner. Acting from the best of motives, as all must concede, to repair the wrong as best he could under the circumstances, he marries the defendant in the full belief that he has been the means of ruining an innocent and chaste woman, and that the child in her womb is his. This belief has been engendered by the false statements of the defendant, purposely made to procure such marriage. The birth of the child proves conclusively that the woman was unchaste before he met her; that she was aware of her pregnancy by another; and that she led him to believe that he alone was the author of her shame, for the express purpose of accomplishing her marriage with him. In my opinion he is entitled to relief. The same reasons that apply in cases where the pregnancy is unknown apply here. A man should not be compelled to assume the burden of supporting a child not his own, or its paternity, against his will, or when his consent is procured by fraud.

The essence of the marriage contract is wanting when the woman, at the time of its consummation, is bearing in her womb, knowingly, the fruit of her illicit intercourse with a stranger; and the result is the same whether the husband is ignorant of her pregnancy, and believes her chaste, or is cog-

nizant of her condition, but has been led to believe the child is his.

"A husband has a right to require that his wife shall not bear to his bed aliens to his blood and lineage. This is implied in the very nature of the contract of marriage. Therefore a woman who is incapable of bearing a child to her husband at the time of her marriage, by reason of her pregnancy by another man, is unable to perform an important part of the contract into which she enters; and any representation which leads to the belief that she is in a marriageable condition is a false statement of a fact material to this contract, and, on well-settled principles, affords good ground for setting it aside, and declaring the marriage void." *Reynolds v. Reynolds*, 3 Allen, 610, per Bigelow, C. J.

And it seems to me that the fraud in this case is a more potent reason for a nullification of the marriage ceremony than it would be in a case where the man was ignorant of the pregnancy. In such a case the woman makes no representation, except as the concealment of her condition may tend in that direction; but here a false statement is made, and an appeal based thereon to the better and kindlier nature of the man, who, moved thereby, undertakes to make restitution for his supposed wrong, and, in so doing, falls easily into the trap laid for him by a wanton and designing woman. He is certainly entitled to a release.

The order of the court below overruling the demurrer is affirmed. The record will be remanded, and the usual time allowed for the defendant to answer, if she desires.

CAMPBELL, C. J., concurred with MORSE, J.

SHERWOOD, J. In this case the complainant files his bill for a decree of divorce from the defendant on the ground that she procured the contract for their marriage by fraud. He alleges in his bill that the fraud consisted in her representing to him, at the time of his engagement to her, that she was in a family way by him when she was not, but was by another. The case is before us on demurrer, and, of course, in considering the question presented, those facts which are well

pleaded, and which are competent and relevant to be proved in sustaining the case made by the bill, must be taken as true, but no others.

The averements in the bill are substantially as follows:

That he first became acquainted with Gertrude Schmitz in the month of June, 1884; that he lived in the county of Monroe, and Gertrude in the adjoining county of Wayne, at that time; that in that month she was visiting in his neighborhood about a week, but how often he saw her during that time does not appear; that she again visited his neighborhood in January, 1885, and remained a month, and then left for her father's home, in Wayne county, as he is informed. How often he saw her during this visit, or if at all, does not appear. That he did not see or hear from her again until the latter part of November, or first of December, when she made another visit to her friends in his neighborhood, and remained about a week. How often he saw her during this visit does not appear, or how old either of the parties were at that time, but it does appear that during this visit he debauched her, by having carnal intercourse with her, and avers he never did before.

The bill further avers that, about six weeks after said last visit, Gertrude requested complainant to go and see her; that she was sick, and had been since her last visit to his neighborhood; that he complied with her request, and went to see her, and she then informed the complainant she was pregnant by him, and insisted upon her "being married to him;" that he was "without experience," and relied upon the truth of her statements, and, being willing to repair any wrong he may have done, and to save the reputation of Gertrude and himself, married her on the tenth day of February, 1886; that he took her to his home in Frenchtown, and from that time forward they lived and cohabited together as husband and wife, until the twentieth day of April thereafter, when his wife was delivered of a full-grown child; that

Gertrude informed him that one Shoemaker was the father of the child, and that he believes said information to be true.

Complainant further avers the child is not his, and that defendant knew it was not when she married him, and that after the birth of the child, as soon as he could procure a suitable nurse for his wife, he left her, and has never lived or cohabited with her since; that defendant intended to deceive and defraud him, by falsely pretending that the child was his at the time he married her; that for that reason the contract is void, and he is entitled to a decree annulling the contract of marriage.

It will not fail to be noticed that, by the averments contained in the bill, no conversation appears to have occurred from the time of their first acquaintance to the time of their marriage, except that of a lewd and lascivious character, or relating to lewd and lascivious subjects.   It nowhere appears in the bill that Gertrude ever told complainant she was pure or virtuous, but it does appear expressly that he knew to the contrary before he married her, for she had already yielded to his licentious approaches, and indulged him in the sensual ways of the harlot.   Complainant nowhere in his bill claims this girl inveigled him into the act of defiling himself and debauching her, but does say she persuaded him to marry her. Nowhere in the bill does complainant state or aver that he did not know at the time he married the defendant she was then pregnant by another person; neither is it anywhere stated that he would not have married the defendant had he known such to be the fact; nor is the time stated when Gertrude informed him that another was the father of the child.

In this case the complainant comes into a court of equity, and shows by his bill that he is a debaucher and fornicator; that he has chosen his companion, and married the woman of his lusts and subject of his lascivious acts; and because

65 MICH.—12.

time has disclosed more acts of immorality against her than it has yet against him, he claims he has been defrauded, and now prays that the marriage between them may be dissolved. Courts of equity cannot follow parties below the plane of good morals, for the purpose of taking cognizance of the faults and vices of dissolute and profligate husbands and wives, with a view of giving a decree of divorce against the party guilty of the greatest delinquencies and immoralities. This, in the view I take of this case, is precisely what we are asked to do, and I can never give my assent to the proposition.

Marriage, in all Christian countries, has always been regarded peculiar in its nature, and subject to many considerations of public policy. It has ever been looked upon as sacred in its nature, and as surrounded by much of religious sanctity. In England it was long under the control of the ecclesiastic courts. In this country, though regarded as a civil contract in law, still it is *sui generis*, and should not be invalidated, "even if fraudulent, when against good policy and sound morality, and the peculiar nature of the relation; and to be free from that restriction the fraud must be of an extreme kind, and in an essential of the contract." The parties cannot cancel or dissolve the marriage contract. They cannot change, alter, or modify it in any particular, and in this State the Legislature cannot dissolve it. A court only can do these things. Public policy requires this. This is essential to the maintenance of virtue and stability in society. The marriage relation is of divine origin. The civil law does no more than make statutes recognizing the relation, and provide for its protection and penalties for its violation. In construing the law, courts should never fail to recognize its origin, and the objects and purposes of its creation; and in dealing with all questions relating thereto, or depending thereon, the object and purpose of the relation is given a controlling influence by the court in disposing of the questions raised.

The causes for which divorce may be granted are limited, and, for the purpose of limiting the number of cases in the class in which the present is included, it is provided by statute:

"No divorce shall be decreed in any case  *  *  where the party complaining shall be guilty of the same crime or misconduct charged against the respondent" (How. Stat. § 6232); and it is further provided that "no marriage shall be annulled on the ground of force or fraud, if it shall appear that, at any time before the commencement of the suit, there was a voluntary cohabitation of the parties as husband and wife" (How. Stat. § 6257).

The bill in this case avers that complainant lived and cohabited with the defendant up to the time of the birth of the child. This he could not have done without being cognizant of the advanced stage of pregnancy of his wife, and of the fact that the child could not have been his, if his other statements are true; and it is not pretended that the cohabitation was not voluntary, and before the commencement of the suit. I think the bill makes a case within the last-named statute, and the demurrer might have well been sustained upon that ground.

There is a mysterious silence in the bill in this case, as to places where, and the circumstances under which, this complainant, previous to the time he had his unlawful intercourse, met with Gertrude. She told him before and at the time of marriage the child was his, and at another time he says she told him the child was Shoemaker's. When did she tell the truth? He says he had intercourse with her but the one time, and the fruits of this could not have been this child; but her statement and his both show him acquainted with her a sufficient length of time to have committed the act which her statement affirms he did. Take any view that we may of the case, as stated in this bill, and it fails to make out that clear case of fraud (if what the complainant alleges is a fraud) which all the authorities say should be required

before the marriage can be declared void for that cause. *Dawson v. Dawson,* 18 Mich. 335; *Leavitt v. Leavitt,* 13 Id. 452; *Guilford v. Oxford,* 9 Conn. 321; *Benton v. Benton,* 1 Day, Cas. 111; 1 Bish. Mar. & Div. §§ 178, 179.

It is the well-settled doctrine that antenuptial incontinence is not ground for divorce. If a woman, being with child, falsely tells a man, with whom she has previously had illicit intercourse, that the child is his, and he, believing her statement to be true, marries her, this will give him no ground for divorce, unless such facts are constituted sufficient cause by statute. *Moss v. Moss,* 2 Ired. 55; *Frith v. Frith,* 18 Ga. 273; *Scott v. Shufeldt,* 5 Paige, 43.

My attention has been called to some authorities, which I will now consider, and which it is claimed support the views of my brethren.

The first is *Baker v. Baker,* 13 Cal. 87. By statute in that state, divorce may be obtained on the ground that consent to the marriage was obtained by fraud. In that case the wife, in four months and nineteen days after the marriage, was delivered of a fully-developed child, begotten by a stranger. She concealed her condition from the husband at the date of marriage, and the husband believed her chaste and virtuous. In the present case the complainant not only knew the defendant was not virtuous, but that she was pregnant at the time he married her. These elements were not in the case cited, besides the case was undoubtedly within the statute of that state. The two cases are quite dissimilar.

In *Reynolds v. Reynolds,* 3 Allen, 605, the character of the fraud which will avoid the marriage is clearly and tersely defined. Reynolds contracted the marriage in good faith, on representations of the woman that she was chaste and virtuous. He was ignorant of her actual condition. She was then pregnant by another man, and after the marriage was delivered of a child It will be noticed in that case the husband had had no criminal conversation with her before mar-

riage, and believed she was chaste when married, after having good assurance she was then virtuous. The present case has none of these important elements in it. That case was made to turn upon them. The court expressly says, at the close of the opinion: "We express no opinion, where pregnancy of the woman has been known to the husband, and he has been induced to enter into the contract of marriage by false representations that he was the father of the unborn child;" and which is this case.

In *Morris v. Morris*, Wright, 630, the wife was delivered of a full-grown child in 24 days after the marriage. The husband was a "simple fellow." She imposed herself upon him as virtuous, and he believed her chaste. There is no intimation that he had any connection with her before marriage, or that he knew anything of her situation until she was taken with labor pains. Her situation had carefully been concealed from him before that time.

In *Ritter v. Ritter*, 5 Blackf. 81, the husband did not know of the pregnancy of the wife until after he married her, and on the night subsequent to the marriage he discovered her situation, and at once abandoned her. It does not appear that he had anything to do with her previous to the marriage, and evidently married her believing she was virtuous. It further appears that the father of the child conspired with the woman in fraudulently and clandestinely bringing about the marriage. The court held the complainant was entitled to have the marriage contract dissolved. That case has but few features of the present.

In *Scott v. Shufeldt*, 5 Paige, 43, the husband was married to the woman after he was arrested as the putative father of her bastard child then born, and which she knew was a negro child, and not his; Shufeldt never having seen it. The parties were both white persons. The wife at the time of the marriage insisted the child was the defendant's, and to avoid the consequences of the litigation, and relying upon the com-

plainant's representations that the child was his, he was induced to consummate the marriage. The court held the circumstances sufficient to entitle the husband to a decree. The case shows that, through perjury and deceit of the complainant, the marriage imposed upon the defendant a degree of social degradation both intolerable and cruel, and the discretion of the court was properly used in the defendant's favor; but, even in that case, it is very clearly intimated by the chancellor that where a party, knowing that he is not the father of a bastard child, is induced to marry the mother to avoid a prosecution, it is not such fraud as will furnish ground for annulling the marriage contract. It is further suggested in that case that, should a man marry a pregnant woman believing the child to be his, and does so on that ground, he could not have a decree of divorce from her, though it was the child of another, and she knew it, if she had been receiving the embraces of both men about the same time. I find nothing in this case supporting the views of my brethren, when the circumstances of each case are compared and duly considered.

Attention is next challenged to *Carris v. Carris,* 24 N. J. Eq. 516. In that case the complaining party was a very young man. He had no knowledge of the wife's pregnancy at the time of the marriage, and never had any previous connection with her; and she, being a shrewd, wily woman, and somewhat advanced, through artifice and deception of various kinds, suppressed her pregnant appearance, and inveigled him into the contract of marriage, within two months after which she was delivered of a full-grown child. The court said the circumstances entitled the complainant to a decree. The court, however, at the same time, took care to say that neither antenuptial incontinence, nor the mistake of a husband as to the paternity of a child born after marriage, but begotten before by another, and the fact suppressed by the wife, where the husband has been guilty of criminal lewd-

ness towards his wife before marriage, will be sufficient to avoid the marriage contract. I do not think the views entertained by my brethren can find any substantial support in this case.

The last case cited to sustain the bill in this case is that of *Barden v. Barden*, 3 Dev. 548. It is decided substantially upon the same grounds as that of *Scott v. Shufeldt*. The child was born before the marriage, and was the fruit of the mother's illicit intercourse with a negro, and which she represented to complainant was the result of her lascivious intercourse with him. What I have said in the *Scott Case* applies with full force in this, and the conclusion reached by the court I think was right.

I have now reviewed all the cases cited and claimed by my brethren to support the views they have taken, and none of them can be said to be founded upon the facts set up in the bill in this case; and, so far as any of the facts stated by complainant are alluded to or pass under the consideration of the court in those cases, they clearly tend to support the demurrer as I read them. The following cases will be found directly in point upon the facts stated in complainant's bill, and fully support the position taken by defendant: *Scroggins v. Scroggins*, 3 Dev. 535; *Foss v. Foss*, 12 Allen, 26; *Crehore v. Crehore*, 97 Mass. 330; *Long v. Long*, 77 N. C. 304.

In this case the complainant, at the time he married the defendant, knew that she was not virtuous. He had had illicit intercourse with her himself. She told him she was then pregnant. It is true, she told him it was by him, but it nowhere appears that she did not tell him she had had intercourse with other men, nor that he ever asked her if such was the fact. It does not appear by the bill that she was engaged to be married to him until she told him she was in a family way; neither does it appear that he ever had any love or affection for her, but, so far as anything is shown upon

the subject, he never called on her before marriage except to gratify his licentious desires, and when he married her it was only to avoid the consequences of bastardy. In what little research I have been able to give to the subject, I have found no case supporting a charge of fraud which will avoid the marriage contract under such circumstances, and I feel that justice, morality, and public policy all alike require that the demurrer in this case should be sustained.

It nowhere appears that this man was young and unsophisticated. He says he was inexperienced, but the first act of his disclosed to us in the record was his carnal intercourse with this lewd and lascivious woman, and after marriage he cohabited with her until her child was born. If what he says in his bill is true upon this subject, the conclusion is irresistible that he knew of her advanced stage of pregnancy, and, after such knowledge, remained and cohabited with her as long as she could yield to his embraces, and then left her and filed this bill. I have found no authority in this, or any other country, which would authorize the nullifying of the marriage contract procured by the woman in representing to the man that she was pregnant by him, when she knew she was pregnant by another, where she had previously had carnal intercourse with the complaining party. Neither equity nor good morals can, in my judgment, tolerate such a doctrine.

When this girl yielded to the lascivious approaches of this complainant, and became defiled by him under the circumstances stated in the bill, she gave him evidence of her true character, and he was bound to take notice, at his peril, that others would be indulged by her under similar circumstances; and when she engaged him in marriage, and told him she was pregnant by him, he had been sufficiently advised that the paternity of the child was liable to be in another, and if, without making any further investigation in the matter, he married her, he knew he did so at the peril of being made

the dupe of misrepresentation without remedy, because their entire intercourse up to the time of marriage had been unlawful, and both parties were *particeps criminis*.

The complainant in his bill nowhere avers that he was "inexperienced in the ways of the world and women," neither does it appear that he believed the defendant virtuous before he met her, nor that he believed he had done her any wrong in the criminal conversation had with her. It appears quite evident to me, from what is contained in the bill, that the complainant married this girl more for the purpose of saving trouble and expense, and to gratify his own selfish purposes, than from any pangs of conscience or sense of duty he owed to her for any wrong he had committed. In fact, it does not appear that he believed he had done her any wrong or injury. It is true, the law looks upon marriage with favor, and even between dissolute persons it is permitted. As between them, marriage is commendable, when entered into for worthy purposes; but otherwise, if consummated as a cover only for vile and vicious acts, or to avoid the consequences of violated law. The bill does not show the girl betrayed by the complainant, but, on the contrary, she appears to have been the willing subject of his lecherous conduct, as well as yielding to the embraces of other men. Evidently he did not contract marriage with her to save her from any shame brought upon her by him. It was something more than moral delinquencies against which he wished to shield himself in consummating the marriage. The civil responsibilities of his situation were evidently uppermost in his mind.

I am not prepared "to concede," neither do I think it appears upon a proper interpretation of the facts stated in the bill, that the complainant "acted from the best of motives," or "to repair any wrong he had done" to an "innocent and chaste woman" in marrying the defendant. I am not yet prepared to believe that, when it is sought to dissolve the

marriage contract, the same rules and considerations are to govern between those who have led wanton, dissolute, and licentious lives as between those who have been virtuous, and have observed all the proprieties of, and obeyed all the rules and regulations governing, that relation, as designed in its original institution. This is a doctrine against which I wish to make and leave my most earnest protest.

I think the decree at the circuit should be reversed.

CHAMPLIN, J.   I concur in a reversal.