GARD *v.* GARD.

1. MARRIAGE—FRAUD—ANNULMENT—PREGNANCY.

Where defendant induced plaintiff to marry her on the representation that he was responsible for her pregnancy, when in fact she was pregnant by another man, plaintiff is entitled to a decree annulling the marriage on the ground of fraud.

2. SAME—APPEAL—GOOD FAITH—ATTORNEY'S FEES.

Defendant's appeal from the decree annulling the marriage having been prosecuted in good faith, the question being an open one in this State, she will be allowed $200 for attorney's fees.

See notes in 18 L. R. A. 375; L. R. A. 1916E, 650.

Appeal from Berrien; Bridgman, J. Submitted October 16, 1918. (Docket No. 71.) Decided December 27, 1918.

Bill by John Jay Gard against Margaret C. Gard to annul a marriage on the ground of fraud. Defendant filed a cross-bill for a divorce. From a decree for plaintiff, defendant appeals. Affirmed.

*O'Hara & O'Hara,* for plaintiff.

*Gore & Harvey,* for defendant.

FELLOWS, J. Plaintiff, a young farmer about 29 years old, lives in Berrien county. Defendant, a woman 31 years old, resided in Chicago prior to her marriage to plaintiff. Plaintiff files this bill to annul the marriage between the parties on the ground of fraud in its procurement. Defendant denies the fraud, and, claiming the benefit of a cross-bill, asks for a decree of divorce. The prayer of plaintiff's bill was granted and defendant appeals. Without detailing the testimony it will suffice to state that from a careful perusal of this record we are convinced that the following facts are established beyond peradventure: (1) That the parties were married February 17, 1916; (2) That they had sustained illicit relations prior to marriage; (3) That the day before the marriage defendant came from Chicago to St. Joseph in this State, there met plaintiff by appointment and there falsely represented that she was pregnant by defendant, which representation was believed by plaintiff who married her to so far as possible repair his wrong; (4) That defendant was delivered of a full-term child March 6, 1916; (5) That said child was not begotten by plaintiff but was the child of another man who was in the Philippines at the time defendant charged plaintiff with its paternity, and that defendant well

knew this to be true; (6) That upon learning that the child was a full-term child and could not be his, plaintiff repudiated defendant and the spurious offspring and has not since lived or cohabited with her.

We therefore have before us for solution the question of whether a bill will lie to annul a marriage procured by the false representation of the wife before marriage that she is pregnant by the man she marries, which misrepresentation is known by her to be untrue, but is believed by the husband and the marriage relation is contracted in such belief, the parties theretofore having sustained illicit relations, when it is established beyond question as matter of fact that the child was begotten by a stranger. In *Sissung* v. *Sissung,* 65 Mich. 168, this court by an equal division sustained such a bill. *Sylvester* v. *Sylvester,* 180 Mich. 512, was also affirmed by an equally divided court; the court was not in accord upon the facts in that case. The precise problem before us must therefore be regarded as one not heretofore solved by this court. It has arisen in other jurisdictions and a want of harmony in these decisions directly and by analogy applicable is at once apparent to one who examines the cases.

In the early case of *Reynolds* v. *Reynolds,* 3 Allen (Mass.), 605, a case similar in principle to *Harrison* v. *Harrison,* 94 Mich. 559 (34 Am. St. Rep. 364), the libellant was induced to enter the marriage upon the representations that the woman was a chaste and virtuous woman, when as matter of fact she was pregnant of another. He had had no illicit relations with her. The court upon that state of facts speaking through Chief Justice Bigelow said:

"As has been already stated, one of the leading and most important objects of the institution of marriage under our laws is the procreation of children, who

204—Mich.—17.

shall with certainty be known by their parents as the pure offspring of their union. A husband has a right to require that his wife shall not bear to his bed aliens to his blood and lineage. This is implied in the very nature of the contract of marriage. * * *

"A man therefore who has contracted a marriage with a woman under such circumstances, if he could not obtain a divorce on the ground of fraud, would be subjected to the painful alternative of disowning the child, and thereby publishing to the world the shame of her who was still to remain his wife, or suffer the presumption of legitimacy to stand, and admit the child of another to share in his bounty and receive support in like manner as his own legitimate children. There is no sound rule of law or consideration of policy which requires that a marriage procured by false statements or representations and attended with such results upon an innocent party should be held valid and binding on him."

The court, however, did not have before it the precise question here involved, viz.: what rule should be applied if the relations of the parties had been illicit prior to the marriage, and expressly reserved that question. In *Foss* v. *Foss*, 12 Allen (Mass.), 26, however, that question arose. This case is quite frequently cited as authority for denying relief and is a leading case upon the subject. An examination of this case leads to the conclusion that the court was impressed that under the circumstances the libellant was not as vigilant as he should have been in ascertaining before marriage whether her representations were true. It is said:

"He took no steps to ascertain the truth of her statements concerning the paternity of the child, but, relying solely on her assurances on that subject, he entered into the contract of marriage. It seems to us that on these facts he was guilty of a blind credulity, from the consequences of which the law will not relieve him. His knowledge of the respondent's unchastity and of her actual pregnancy was sufficient to put a reasonable man on his inquiry."

It was followed in *Crehore* v. *Crehore*, 97 Mass. 330 (93 Am. Dec. 98), the opinion in which case in full is as follows:

"The facts show that the libellant had full knowledge that the libellee was unchaste, before he entered into the marriage contract, and was thereby put on his guard so that he cannot allege that he was induced to contract the marriage by such fraud and deceit on the part of the libellee as will enable him to avoid the contract."

—and *Foss* v. *Foss* is cited as authority for the holding.

In the late case of *Safford* v. *Safford*, 224 Mass. 392 (113 N. E. 181, L. R. A. 1916F, 526), the same question again arose, and again upon the authority of *Foss* v. *Foss*, the relief was again denied, the court among other things saying:

"In view of the undisputed facts as disclosed by the record, it seems plain that he is not entitled to a decree declaring the marriage void in the absence of evidence to show that he made any inquiry or investigation to ascertain the truth of her statement that he was the father of the child."

These holdings of the Massachusetts court are not as persuasive to us as the holdings of that court usually are, due to the fact that this court has repeatedly held in cases involving fraud that it does not lie with one charged with fraud, who assumes to have knowledge of a subject of which another may well be ignorant, to claim that such other should have used greater diligence to discover the fraud, should have been more vigilant, less credulous. *Eaton* v. *Winnie*, 20 Mich. 156 (4 Am. Rep. 377) ; *Smith* v. *McDonald*, 139 Mich. 225; *Yanelli* v. *Littlejohn*, 172 Mich. 91; *Lewis* v. *Jacobs*, 153 Mich. 664; *Smith* v. *Werkheiser*, 152 Mich. 177 (15 L. R. A. [N. S.] 1092, 125 Am. St. Rep. 406) ; *John Schweyer & Co.* v. *Mellon*, 196 Mich. 590; *Johnson* v. *Campbell*, 199 Mich. 186.

In *Carris* v. *Carris*, 24 N. J. Eq. 516, the New Jersey court had before it a case upon the facts similar to *Reynolds* v. *Reynolds, supra,* and it was disposed of in the same manner, the court saying:

"The fraud charged in this case is extraordinary, peculiar, and of the most flagrant character, entering into the very essence of the contract, and if allowed to succeed, either compelling the husband to disown the child for his own protection, or imposing upon him the necessity of recognizing and maintaining the fruit of his wife's defilement by another, and having it partake of his inheritance. In either event, shame and entire alienation are the inevitable consequences. Surely, there can be no good policy in such action as will either compel parties to live together under these circumstances, having only the shadow of marriage, or compel them, as would be more likely, to live totally separated, a continual annoyance to each other, and a source of the greatest unhappiness. If the contract is repudiated as soon as the fraud is discovered, so that there is no acquiescence in it, good morals and the protection of the integrity of the marriage relation require that an innocent man should be relieved from so great a fraud."

In *Seilheimer* v. *Seilheimer,* 40 N. J. Eq. 412 (2 Atl. 376), and *Fairchild* v. *Fairchild,* 43 N. J. Eq. 473 (11 Atl. 426), that court had before it the question here involved. In both cases the parties had sustained illicit relations before marriage, and in both cases the woman had represented that she was pregnant by the man induced to marry her when in fact she was pregnant by another. In both cases the relief was denied. Both cases seem to go upon the theory that the parties were *in pari delicto* and must abide the consequences.

The forceful language of Mr. Justice Field, then a member of the supreme court of California and later Justice of the Supreme Court of the United States, in the case of *Baker* v. *Baker,* 13 Cal. 87, may well be considered. He said:

"A woman, to be marriageable, must, at the time, be able to bear children to her husband, and a representation to this effect is implied in the very nature of the contract. A woman who has been pregnant over four months by a stranger, is not at the time in a condition to bear children to her husband, and the representation in this instance was false and fraudulent. The second purpose of matrimony is the promotion of the happiness of the parties by the society of each other, and to its existence, with a man of honor, the purity of the wife is essential. Its absence under such circumstances as necessarily to attract attention must not only tend directly to the destruction of his happiness, but to entail humiliation and degradation upon himself and family. We can conceive no torture more terrible to a right-minded and upright man than an union with a woman whose person has been defiled by a stranger, and the living witness of whose defilement he is legally compelled to recognize as his own offspring, as the bearer of his name and the heir of his estate, and that, too, with the silent, if not expressed, contempt of the community."

Later, however, the supreme court of California in *Franke* v. *Franke* had before it a case where illicit relations had been indulged in prior to the marriage. The wife was pregnant of another at the time of the marriage. The opinion is not reported in the official reports of the court (see 96 Cal. XVII) but is found in 31 Pac. 571 and 18 L. R. A. 375. An examination of the opinion discloses that the husband was a man of 40 years, father of five children by a former wife, who claimed he was seduced by a 17-year-old girl, daughter of a neighbor, and who married the girl to avoid a lawsuit, and rather than "give money away," and with the further assurance from the attorney of the girl that if the birth of the child did not correspond with "plaintiff's reckoning" he would get him free "without a cent." Under these facts the relief was denied.

Let us now turn to the North Carolina cases. The

case of *Scroggins* v. *Scroggins*, 3 Dev. (N. C.) 535, is a much cited case. It was written in 1832 when that court was made up of Henderson, Ruffin and Daniel, and the great learning of these eminent jurists entitles it to more than ordinary consideration. In that case the child born to the woman was a mulatto and could not have been begotten by the husband; the birth occurred about five months after the marriage; the relief was denied. But the force of the opinion is minimized if not entirely negatived by the case which follows it in the same volume, that of *Barden* v. *Barden*, 3 Dev. (N. C.) 548, decided at the same term. In that case the man was induced to marry a woman, with whom he had been intimate, upon the representation that a child she had was his; the child was the offspring of a negro and the relief was granted. By way of explanation it was said that the case was a concession to the "deep-rooted prejudices" of the community on the subject. It may be well to understand the legislative policy of that State upon the subject of marriage and divorce at the time the *Scroggins Case* was written. An examination of the legislation of the State indicates a strong inclination to regard the marriage relation as indissoluble. The act of 1827, before the court in the *Scroggins Case*, contained some general language considered fully by Mr. Justice Ruffin, but specifically enumerated but two grounds of divorce, being the same grounds found in the act of 1814, viz.: (1) impotency at the time of the marriage and still continuing: and (2) separation by one party from the other and living in a State of adultery. That the legislative policy was deliberate and fixed is evidenced by the further fact that although the court called attention of the legislature to the construction put upon the added general words of the act of 1827 no change was made for nearly half a century and it was not until 1871 that adultery, unless

amounting to lewd and lascivious cohabitation, was made grounds of divorce. That the courts followed the legislative policy is evidenced by the case of *Moss v. Moss,* 2 Ired. (N. C.) 55, where the court declined to dissolve the marriage, even though the wife was living in open adultery with another; the court basing its decision on the ground that the husband had without cause driven the wife from his home without providing for her support and had thereby submitted her to the temptations to which her weakness and necessities exposed her. Indeed in the *Scroggins Case* it clearly appears that the court viewed the rules of the ecclesiastical law as preferable to the common law, as it was expressly stated that, "There is no member of the court who is not strongly impressed with the conviction that divorces ought in no cases be allowed, but in that already mentioned (impotency) and near consanguinity." It was in this atmosphere that *Scroggins* v. *Scroggins* was written. The North Carolina court has followed it but not without dissent; see *Long* v. *Long,* 77 N. C. 304 (24 Am. Rep. 449) ; *Bryant* v. *Bryant,* 171 N. C. 746 (L. R. A. 1916E, 648, 88 S. E. 147). Whether the legislative policy of that State is better than the legislative policy of this State is a question upon which publicists may differ, but it is not a question for our solution.

In *Scott* v. *Shufeldt,* 5 Paige (N. Y.), 43, the marriage was procured on the representation that the child was the child of the husband. Both the husband and wife were white. The child was a mulatto and could not have been begotten by the husband. It was held that if the husband married in the belief that the child was his the marriage should be annulled on the grounds of fraud.

Three courts of last resort have recently spoken on this subject with definiteness and precision upon facts substantially on all fours with the instant case.

*Lyman* v. *Lyman*, 90 Conn. 399 (L. R. A. 1916E, 643, 97 Atl. 312); *Di Lorenzo* v. *Di Lorenzo*, 174 N. Y. 467 (67 N. E. 63, 63 L. R. A. 92, 95 Am. St. Rep. 609); *Wallace* v. *Wallace*, 137 Iowa, 37 (114 N. W. 527, 14 L. R. A. [N. S.] 544, 126 Am. St. Rep. 253, 15 Ann. Cas. 761). In two of these cases the opinion by Mr. Justice MORSE, concurred in by Mr. Justice CAMPBELL, in *Sissung* v. *Sissung, supra,* is expressly approved. In *Lyman* v. *Lyman, supra,* the court, after quoting from that opinion, says:

"We can conceive of few graver frauds than this, nor one which, if successful, is attended with more serious results; and we can see no good reason why, if the essentials of a fraud, as respects the representations by the one party and the reasonable reliance thereon and action induced thereby by the other, are present, the one thus defrauded should be compelled to endure in silence the situation which has thus been brought upon him, with all the consequences that it entails, and all by reason of his efforts to play the manly part and repair his supposed wrong to the best of his ability. That seems to us to be imposing a grievous punishment for a purely laudable action. The punishment attaches to the marriage, and not to the earlier impropriety, and subjects a man to penalties for an act which had in it no semblance of wrongdoing, either legal or moral.

"In view of the new trial which must be ordered and the prominence which has been given to the opinion in *Foss* v. *Foss, supra,* and to the subordinate propositions it advances, we ought to add that we are unable to agree with that case in all of its subordinate propositions, or with its ultimate conclusion as to the duty, in the matter of independent and searching investigation, of a man in the position that Foss and this plaintiff found themselves when the partners in their illicit relations made to them the representations they did as to their pregnancy and the paternity of their children before being justified in accepting those representations as true and acting upon them."

In *Di Lorenzo* v. *Di Lorenzo, supra,* the facts do

not as fully appear as they do in the report of the case in the appellate division (see 71 App. Div. 509, 75 N. Y. Supp. 878). From the facts it appears that defendant's equities were much greater than in the instant case. In the unanimous opinion of the court of appeals it was said:

"In this case, the representations of the defendant was as to a fact, except for the truth of which the necessary consent of the plaintiff would not have been obtained to the marriage. It was designed to create a state of mind in the plaintiff, the operation of which would be to yield a consent to marry the defendant, in the belief that he was rectifying a great wrong. The minds of the parties did not meet upon a common basis of operation. The artifice was such as to deceive a reasonably prudent person and to appeal to his sense of honor and of duty. The plaintiff had a right to rely upon the defendant's statement of a fact, the truth of which was known to her and unknown to him, and he was under no obligation to verify a statement, to the truth of which she had pledged herself. It was a gross fraud and, upon reason, as upon authority, I think it afforded a sufficient ground for a decree annulling the marriage contract. The jurisdiction of a court of equity to annul a marriage, for fraud in obtaining it, was early asserted in this State by the court of chancery, at a time when the limited powers of courts of law were inadequate for the purpose. This jurisdiction was expressly rested upon the general power to vacate contracts in all cases, where they had been procured by fraud. From this general jurisdiction of equity a contract of marriage was not regarded as being excepted, when the assent to it was the result of artifice, or of gross fraud."

In the case of *Wallace* v. *Wallace, supra,* the supreme court of Iowa, speaking through Chief Justice Ladd, and considering the claim that prior relations barred the relief, said:

"But this would leave the unsophisticated and unwary without protection and condemn him who, with the best of motives, undertakes reparation for his

supposed victim and compel him to suffer the consequences and burden of her deception. If the proof be of that character exacted in such cases, there can be no objection on grounds of public policy to granting a decree of divorce whenever it is made to appear that the wife at the time of her marriage was pregnant by another than her husband, of which fact he was unaware. As said by MORSE, J., in the Michigan case:

" 'The essence of the marriage contract is wanting when the woman at the time of its consummation is bearing in her womb knowingly the fruit of her illicit intercourse with a stranger; and the result is the same whether the husband is ignorant of her pregnancy and believes her chaste, or is cognizant of her condition, but has been led to believe the child is his.' "

The court then considers the rule permitting proof as to illegitimacy of children born in lawful wedlock, a rule this court has recognized, at the same time holding that the proof must be convincing (*People* v. *Case*, 171 Mich. 282), and continues:

"Inquiry is permitted into the parentage of children born in wedlock, and inquiries into the paternity of a child begotten prior thereto can be fraught with no greater danger to the parties interested, to society, or the State. On the contrary, it may operate to shield the confiding who, though guilty of moral wrong, has not violated the law, and has acted with the best of motives in entering into the marital relation, induced by deception and fraud. Because of this he ought not to be condemned to consort with her whose dupe and victim he is proved to be during life and to bear the burden of supporting her spurious offspring."

We have considered the decisions of the various States to which our attention has been challenged in the briefs together with such as our time for independent research would permit, where the question has been presented with any degree of frequency or considered at length. Many other cases bearing either directly or indirectly on the subject have also been examined, among them being *Morris* v. *Morris*, Wright

(Ohio), 630; *Hoffman* v. *Hoffman,* 30 Pa. St. 417; *Todd* v. *Todd,* 149 Pa. 60 (17 L. R. A. 320, 24 Atl. 128) ; *Allen's Appeal,* 99 Pa. 196 (44 Am. Rep. 101) ; *Ritter* v. *Ritter,* 5 Blackf. (Ind.) 81; *Steele* v. *Steele,* 96 Ky. 382 (29 S. W. 17).

We are persuaded that we should adopt the doctrine advanced by Justices MORSE and CAMPBELL in *Sissung* v. *Sissung, supra,* and the three recent cases heretofore adverted to. That this plaintiff has been defrauded, deceived and tricked into this marriage we entertain no doubt. It is intolerable to believe that he should be compelled to continue through life as the husband of defendant, caring for, as his own, this bastard child of another, with its constant reminder of his wife's perfidy before marriage, because in attempting to right a supposed wrong he entered into the contract of marriage. That a man may have a true parental affection for the child that sprang from his own loins even though conceived before marriage is natural; but, that he should have such affection for one that sprang from the loins of another man and was foisted upon him by a designing woman is unbelievable. It has been said in many of the cases cited that one of the great purposes of marriage is procreation. It is evident that a wife pregnant by another cannot carry out that purpose and hence that purpose of marriage must fail. All true, but there are other purposes of marriage beyond the perpetuation of the species. One of the purposes is the maintenance of the sacred institution called home. It has been said that there are three parties to the contract of marriage, the two contracting parties and the public. Can it be that a wise public policy requires in the name of home the maintenance by the husband of an establishment presided over by one who has deceived him as to the paternity of the little one who daily sits at his board, who bears his name, who will

in the absence of testamentary disposition inherit his property, the offspring of another, a stranger to his blood? Most assuredly not. We do not palliate plaintiff's infraction of the moral code. Society will visit its penalties upon him. We are not the keepers of his conscience or the censors of his morals. We can only administer the law, imposing penalties only that are imposed by the law, granting relief only as the law affords relief. Under the law this plaintiff is entitled to be relieved from this contract of marriage, procured by fraud, and a fraud well calculated to deceive under all the facts in the case, and which did deceive the plaintiff and caused him to do the only thing an honorable man could do after his transgression of the moral code with its supposed result.

We do not overlook the claim most earnestly pressed by defendant's counsel at the argument and in the brief that during the acquaintance of the parties defendant informed plaintiff that she had had intercourse with another. It is urged that this should have prompted more vigilance on the part of plaintiff. We have already called attention to the holdings of this court upon this subject, and certain facts to which we shall presently refer will demonstrate that the circumstances would readily prompt a reasonably prudent man to believe defendant's claim as to the paternity of the child. If plaintiff was seeking annulment of the marriage on the sole grounds of want of chastity of his wife he could not successfully assert he had been defrauded if he had knowledge on the subject before the marriage. Nor under the authorities could he assert her want of chastity as grounds of annulment, where he himself had been a party to her unchaste conduct. The gist of the action here, the right to relief is based upon the ground that she has falsely represented herself to be pregnant by plaintiff, when as matter of fact she was pregnant by

another; as was said by the supreme court of Texas in *McCulloch* v. *McCulloch,* 69 Tex. 682 (5 Am. St. Rep. 96, 7 S. W. 593):

"It is settled law that the husband cannot have the marriage annulled because the wife was with child by him at the date of the marriage. If a condition of pregnancy at that time is, under any circumstances, an impediment to marriage, it must be because it will impose upon the husband a spurious offspring."

The plaintiff might have been willing to protect the woman with whom he had been intimate and who he supposed was pregnant by him, even though she had been unchaste before he ever saw her, but at the same time no right-thinking man would be willing to take as wife a woman pregnant by another.

Nor do we overlook defendant's claim made in her testimony that plaintiff had agreed to marry her and that the marriage took place pursuant to that agreement rather than as a result of fraudulent statements. While she testifies that he spoke to her of love and "all that stuff," and it is admitted that he addressed her in his letters as, "My dear Margaret," it is a significant fact that none of the letters passing between them were preserved by either party. Their correspondence seems to have been somewhat desultory, their meetings and illicit relations infrequent until the occasion when defendant claims the child was begotten, and which must have been some time after she became pregnant, if the child was a full term child as testified to by the physicians and as we believe it was. On July 17, 1915, defendant came over from Chicago. She telephoned plaintiff and he came down and met her at the hotel. It is admitted by both that they sustained illicit relations that evening. Shortly thereafter they went on a camping trip together at Stevensville near the lake. Here they lived together in a tent for about a week, without a chaperon, and

apparently without restraint. Defendant was then pregnant by another man. She returned to Chicago and there is no testimony from her or any one else that she ever claimed plaintiff was the father of her child until the occasion of her trip to St. Joseph the following February, which was about three weeks before her confinement. In view of the relations of the parties during the previous summer it is not to be wondered that plaintiff accepted at par defendant's claim that he was the father of her unborn child, and married her the following day to so far as possible right the wrong he supposed he had inflicted upon defendant, and to give his name to the child he supposed to be his. We are satisfied that there was no promise of marriage, no thought of marriage between them until this February meeting. Defendant's claim in this regard does not ring true.

It follows from what we have said that the decree of the court below must be affirmed. The appeal has been prosecuted in the utmost of good faith. The question was an open one in this State. Defendant had the right to take the judgment of this court upon it. An allowance of $200 for her attorney fees will be made. *Frith* v. *Frith*, 18 Ga. 273 (63 Am. Dec. 289). The calendar entries in the record indicate that the cost of transcript and printing the record has already been provided for. If not it may be brought up on the settlement of the decree.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, STONE, and KUHN, JJ., concurred.