■ Stated in *Kuntz,* and inherent in *Cole* by quotation, is the mandate that neither party nor the court may, after reconciliation, take an adverse step in the cause.

■■ The *pendente lite* order dies in all regards when a judgment *nisi* is entered unless there is a specific reservation. *Lief v. Lief,* 14 *N. J. Misc.* 27 (*Ch.* 1935), affirmed 117 *N. J. Eq.* 483 (*E. & A.* 1935). In a judgment of dismissal predicated on a reconciliation there can be no reservation because such would be an adverse order. *Cole v. Cole, supra.* It would be adverse in that it would subject defendant, among other things, to a contempt citation and to execution — both the progeny of an adverse order.

The provision in the proffered judgment of dismissal will be deleted.

B., PLAINTIFF, v. S., DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided February 23, 1968.

Mr. *Morgan E. Thomas* for plaintiff.

Mr. *Charles H. Recht* for defendants (*Messrs. Stanton & Recht,* attorneys).

HORN, J. S. C.   Plaintiff seeks judgment annulling his marriage to defendant on the ground that she fraudulently procured same by misrepresenting that he had caused her pregnancy.

Though defendant entered her appearance in the action and was present at the hearing with counsel, neither plaintiff nor any of his witnesses were cross-examined. Defendant presented no evidence although given the opportunity to do so.

The parties (both Caucasian) were married September 11, 1965, at which time plaintiff was 20 and defendant 18. They had been acquainted since 1960, when he was 16 and she was 14. Plaintiff was a resident of Atlantic County and defendant a summer visitor at her grandparents' home there. Their friendship developed with the passage of time, so that they visited each other during the winter months after 1961. By early 1965 they agreed to be married after defendant concluded her college education.

During the summer months of 1965 defendant secured employment as a waitress in a restaurant in Atlantic City. During this time plaintiff had intercourse with her infrequently. Late in August of that year she told him that she was pregnant. After a medical test had definitely established her pregnancy they discussed this fact with their parents. They were married September 11, 1965.

Before the marriage, although plaintiff had been given no reason to suspect anything to the contrary, he asked defendant if there was a possibility that her pregnancy was caused by any one else. She assured him that she had not had sexual intercourse with any person other than plaintiff.

Following the marriage ceremony the parties lived compatibly, first in an apartment and later in a house which plaintiff purchased in his own name with the intention of causing title to be placed in their joint names after defendant attained her majority.

On April 6, 1966, defendant was delivered of a female child at a local hospital. As the child grew older it took on

a distinct negroid physiognomy. When plaintiff expressed surprise at the child's color shortly after her birth, defendant explained to him that her maternal ancestors were fairly dark-complexioned.

As time passed and the child's features became more distinct, plaintiff thought that it might have suffered some internal disorder causing this appearance. Consequently, he consulted the family doctor. The physician then informed him that the child was a Negro.

On further questioning, defendant told plaintiff that during the summer of 1965 she had been raped by a Negro when she was returning from work one evening; that she did not report this to the police because she thought it would result in publicity, and that she did not tell plaintiff because she was fearful it might change his affection for her.

Finally, as the result of an independent investigation plaintiff learned—and when she was confronted defendant admitted—that she had not told the truth. It became evident that defendant had voluntarily engaged in sexual intercourse with a negro porter who had been a fellow employee at the aforementioned restaurant.

Plaintiff separated from defendant and immediately filed this action.

Is plaintiff entitled to a judgment annulling this marriage?

Where a wife has concealed from her husband at the time of the marriage the fact that she had become pregnant by another man, the marriage, although consummated, may be annulled at the suit of the husband under the general equity jurisdiction of the Chancery court. *Carris v. Carris,* 24 *N. J. Eq.* 516 (*E. & A.* 1873); *DiTullio v. DiTullio,* 102 *N. J. Eq.* 141 (*Ch.* 1928), *affirmed* 104 *N. J. Eq.* 496 (*E. & A.* 1929); *Sinclair v. Sinclair,* 57 *N. J. Eq.* 222 (*Ch.* 1898).

But such relief has been denied under the same circumstances where the husband also participated in prenuptial intercourse with his wife, notwithstanding that it was clear

that plaintiff was not the father of the child. *Carris v. Carris, supra; Fairchild v. Fairchild,* 43 *N. J. Eq.* 473 (*Ch.* 1887), where such facts were raised as a defense to an action brought by the wife for separate maintenance; *Seilheimer v. Seilheimer,* 40 *N. J. Eq.* 412 (*Ch.* 1885), an annulment case; *States v. States,* 37 *N. J. Eq.* 195 (*Ch.* 1883), where a divorce was sought on the ground of fraud. The denial of relief is generally posited on the ground that in such cases the husband has been guilty of unclean hands. In *Fairchild, supra,* the vice-chancellor said (at *p.* 477) : "They are equally filthy and abominable in the eye of the law." In *States, supra,* plaintiff's prenuptial intercourse with defendant was termed by the vice-chancellor as "one of the grossest acts of immorality" (at *p.* 156).

█ The State is a third party in every matrimonial action seeking to sever or void the bonds of matrimony. It is the duty of the trial judge, even in an uncontested case, to see to it that the severance is not granted except where warranted under the applicable statutes or the general equity jurisdiction of the court. *In re Backes,* 16 *N. J.* 430 (1954) ; *Kress v. Kress,* 1 *N. J.* 257 (1949) ; *Carris v. Carris, supra.*

The above quoted statements of the courts in *Fairchild* and *States, supra,* were expressions of the thinking of Victorian days.

That was an era when law was established too often without regard to the realities of human frailty. We should not be bound by strict and unrelenting views which can only cause heartache and misery out of all proportion to conduct.

This, of course, does not mean that today it is to be considered any less a wrong to engage in premarital sexual intercourse. But the effect of such relations under the circumstances exhibited in this case does not deserve the consequences of a denial of relief to plaintiff.

The modern trend of our law permits a more practical treatment. Since the denial of relief in the above-cited cases was put upon the ground of unclean hands, we examine our obligation in the instant case.

434

■ The doctrine of unclean hands is "neither puristic nor mechanical, but an equitable principle to be applied according to the circumstances of each case and with a proper respect for the paramount interests of the community at large." *Wells v. Wells,* 79 *N. J. Super.* 388, 397 (*App. Div.* 1963) (dissenting opinion). Our Supreme Court, in reversing both the trial court as well as the Appellate Division, 41 *N. J.* 594 (1964) approved the views expressed in the dissent. It said that "assuming that a court ordinarily has discretionary power to raise, *sua sponte,* a recriminatory bar to plaintiff's cause of action for divorce, we agree that the judge should not have exercised that discretion under the factual complex here present."

In the instant case, as I have already noted, defendant has raised no defense whatever. The case was uncontested. Plaintiff testified to the premarital relationship in recounting all the facts. Both parties are young. Their lives are before them. There is no possibility, under the circumstances, of a reconciliation or plaintiff's adopting the child. The premarital intercourse did not occur as part of a deliberate plan by plaintiff to seduce defendant.

"Unclean hands" is not a doctrine to be applied automatically and mechanically; it allows room for equitable considerations arising out of time, place and circumstance. *Wells, supra,* 79 *N. J. Super.,* at *p.* 397.

■ With these views in mind and considering the flexibility permitted, I find that plaintiff has not been guilty of such conduct that he should be denied the relief sought by him.

The view adopted by our courts in denying relief because of prenuptial intercourse is opposed to the present trend of authority. 12 *N. J. Practice (Herr, Marriage, Divorce, Separation)* § 1512, *p.* 73 (1963); *Morris v. Morris,* 40 *Del.* 480, 13 *A. 2d* 603 (*Sup. Ct.* 1940); *Jackson v. Ruby,* 120 *Me.* 391, 115 *A.* 90 (*Sup. Jud. Ct.* 1921); *Gard v. Gard,* 204 *Mich.* 255, 169 *N. W.* 908, 11 *A. L. R.* 923 (*Sup. Ct.* 1918); *Gordon v. Gordon,* 225 *App. Div.* 822, 232 *N. Y. S.*

541 (*App. Div.* 1929). See also *Parks v. Parks,* 418 *S. W. 2d* 726 (*Ky.* 1967).

Having found as a fact that all jurisdictional requisites are present, a judgment *nisi* will be entered.