1998 OK 24

**Jimmy D. MILLER, Plaintiff–Appellant,**

v.

**Judy A. MILLER a/k/a Judy Hall, Bill Hall, and Nora Hall, Defendants–Appellees.**

**No. 87615.**

Supreme Court of Oklahoma.

March 24, 1998.

---

Jack Tracey, Purcell, for Appellant.

W.S. Haselwood, Shawnee, for Appellee Judy A. Miller a/k/a Judy Hall.

Virginia Henson, Shawnee, for Appellees Bill and Nora Hall.

OPALA, Justice.

¶ 1 The dispositive issue presented on certiorari is whether the trial court erred in dismissing the plaintiff's action for damages and equitable relief against the defendants, who allegedly made false representations that plaintiff was the father of defendant Judy A. Miller's child and who revealed to the child, almost fifteen years later, that plaintiff was not the child's father. We answer in the affirmative as to plaintiff's damage claim, but in the negative as to his claim for equitable relief.

¶ 2 Jimmy D. Miller ("Jimmy") sued his former wife, Judy A. Miller a/k/a Judy Hall (now Judy Childers) ("Judy") and her parents, Bill and Nora Hall ("Judy's parents") for damages and equitable relief based on the theories of fraud, intentional infliction of emotional distress, and quantum meruit. He alleges in his petition that for the purpose of inducing him to marry Judy, defendants in 1980 knowingly misrepresented to him that she was pregnant with his child, and continued to perpetrate this fraud against him for the next fifteen years for the purpose of causing him to perform the duties of husband and father. He further alleges that after carrying out this fraud for almost fifteen years and permitting him to develop a loving parent-child relationship, Judy and her parents suddenly and unexpectedly pulled the proverbial rug out from under him by revealing to the child that Jimmy was not in fact her father. Jimmy alleges that the defendants then further undermined his bond with the child by encouraging her to develop a relationship with her "real father" and her "real family."

¶ 3 The defendants responded with a motion to dismiss the petition for failure to state a cause of action. The trial judge granted defendants' motion, and plaintiff appealed. The Court of Civil Appeals, Division No. 1, affirmed the order of the trial court, holding that plaintiff cannot recover under (a) the theories of fraud or quantum meruit because he is prohibited by the provisions of 10 O.S. 1991 § 3 from disputing paternity, and (b) the theory of intentional infliction of emotional distress because the acts complained of fail to meet the minimum degree of outrageousness necessary to state, prima facie, a claim for intentional infliction of emotional distress. We disagree and hold that plaintiff's petition states a claim for fraud and intentional infliction of emotional distress, but not for unjust

enrichment. More particularly, we pronounce that (a) the provisions of 10 O.S.1991 § 3 are inapplicable to plaintiff's fraud-based action at law,[1] (b) plaintiff's action is not barred by preclusion doctrine, (c) Oklahoma recognizes a claim for fraudulent inducement into a valid marriage where the fraud goes to the essentials of the marital relationship, (d) plaintiff's petition states, prima facie, a case of intentional infliction of emotional distress, and (e) plaintiff fails to state a claim for which he may recover on a theory of unjust enrichment.

# I

## THE ANATOMY OF LITIGATION

¶ 4 Jimmy D. Miller and Judy A. Hall were dating in the early months of 1980. Jimmy was seventeen years old and Judy was fifteen. According to Jimmy, in March of 1980, Judy and her parents, Bill and Nora Hall, informed him that Judy was pregnant, that the child was his, and that the child could only be his inasmuch as Judy had not had sexual relations with any man other than Jimmy. Relying on these representations, Jimmy married Judy on October 24, 1980, and they proceeded to live as husband and wife for nearly five years.

¶ 5 The child Judy was carrying at the time of her marriage to Jimmy, subsequently named A, was born on December 29, 1980. During their nearly five-year marriage, Jimmy, together with Judy, raised the child as his own, never disputing her legitimacy, believing at all times that the little girl was his biological child. Jimmy and Judy divorced in 1985. The divorce decree recites that Jimmy and Judy are the parents of a minor child named A. Jimmy alleges that Judy made that recitation to the court in the divorce proceeding, knowing it to be false. The court ordered Jimmy to pay child support for A in the amount of One Hundred Fifty Dollars ($150.00) per month beginning on August 1, 1985. Jimmy alleges that he has faithfully paid that amount as ordered. He was grant-

ed joint, but not primary, custody of A and has maintained a continuous parent-child relationship with his daughter since the divorce.

¶ 6 In early 1995, when A was approximately fifteen years old, she decided she no longer wanted to live with her mother. She moved into Jimmy's home. According to Jimmy, in January, 1996, almost one year after coming to live with her father, A informed him that when she had originally expressed a desire to live with him, her mother and her grandparents, Bill and Nora Hall, had told her that Jimmy was not her real father and had urged her to "get to know her 'real' family." According to Jimmy, A told him that her mother and grandparents had identified her real father, had introduced her to members of her "real family," had given photographs of A to members of this "real family", and had stated to her that there was nothing either she or Jimmy could do about it.[2] Jimmy states that A's revelations in January, 1996 were the first notice he had had that Judy and her parents had deceived him in 1980 as to his paternity of the child Judy was then carrying. Jimmy and A underwent that very month a paternity test, which verified that Jimmy was not A's biological father.

¶ 7 Jimmy filed his petition on March 8, 1996, approximately two months after first learning that his paternity of A was being denied by his ex-wife and her parents. *For his first theory of recovery,* Jimmy alleges that he was fraudulently induced to marry Judy in 1980 by the knowing misrepresentations of Judy and her parents that he was the father, and that he was the only man who could possibly be the father, of the child with whom she was then pregnant because she had not had sexual intercourse with any other man. Relying on these allegedly knowing misrepresentations, Jimmy married Judy and took on the responsibilities of husband and father. For this fraud, Jimmy seeks damages against all defendants, including an amount equal to the sum of the court-ordered

---

1. For a discussion of recoverable and nonrecoverable elements of damage in an action for the type of fraud alleged here, see *Nagy v. Nagy,* 210 Cal.App.3d 1262, 258 Cal.Rptr. 787 (1989).

2. Some of these facts, which stand uncontroverted, were gleaned from plaintiff's briefs.

child support payments made since 1985, plus punitive damages.

¶ 8 *For his second theory of recovery,* Jimmy alleges that the defendants' marriage-inducing misrepresentations, the cruel paternity hoax perpetrated against him for fifteen years, the callous revelation of this hoax to him through A, and the effort to undermine his bond with A amount to extreme and outrageous conduct, causing him severe emotional distress. For the tort of intentional infliction of emotional distress, Jimmy seeks damages against all defendants.

¶ 9 *For his third theory of recovery,* Jimmy alleges that Judy has been unjustly enriched at his expense by an amount equal to the monthly court-ordered child support of One Hundred Fifty Dollars ($150.00) per month, which he has paid since August, 1985. Jimmy seeks from Judy restitution of all sums paid to her as child support and other equitable relief.

¶ 10 The defendants jointly filed a motion to dismiss in which they admitted only that (a) A was conceived in March of 1980, (b) Jimmy was seventeen years old at the time and Judy was fifteen, (c) Jimmy and Judy married in October, 1980, (d) A was born on December 29, 1980, and (e) Jimmy and Judy lived as husband and wife and raised A as a member of their family until their divorce in 1985.

¶ 11 The defendants urged the trial court to dismiss Jimmy's petition for failure to state a claim upon which relief may be granted. They argued that the provisions of 10 O.S.1991 § 3 and the doctrine of res judicata bar Jimmy from recovering damages or obtaining other relief from them on any of the theories advanced. The trial court agreed and granted defendants' motion to dismiss. Jimmy appealed.

¶ 12 In a split decision the Court of Civil Appeals affirmed the trial court's order, holding that in order to prove his fraud and quantum meruit damages, Jimmy would have to dispute his paternity of A. This, the Court of Civil Appeals ruled, is barred by the terms of 10 O.S.1991 § 3, which provide a two-year time limit for disputing paternity under certain circumstances, all of which obtain here.

Noting the absence of an explicit exception for fraud in Section 3, the appellate court refused to create an implied exception, saying that "[t]he desire to protect innocent children and to foster long term parental bonds is not furthered by creating a fraud exception." Characterizing Jimmy's request for damages as "the return of all child support paid along with interest," the Court of Civil Appeals held that since Jimmy was A's legal father at the time he was ordered by the court to pay child support, he was and continues to be legally obligated to make such payments, and is not entitled to the return of that which he was and still is legally obligated to pay. Having determined that under the provisions of 10 O.S.1991 §§ 1 et seq. Jimmy was A's legal father at the time of the divorce, the Court of Civil Appeals deemed it unnecessary to inquire into whether Judy had fraudulently misled the court in the divorce action about Jimmy's paternity of A. As for Jimmy's claim for intentional infliction of emotional distress, the appellate court held that the facts alleged in the petition as the basis for Jimmy's claim, characterized as "confessing a fifteen-year lie to the child and revealing the identity of her biological father", could not be construed by reasonable people as extreme and outrageous, and could not therefore, as a matter of law, support a verdict in Jimmy's favor.

¶ 13 The dissenting judge conceptualizes Jimmy's lawsuit quite differently. She points out that Jimmy's action is not one to establish or disestablish paternity and, therefore, there is no need to inquire whether an exception for fraud can be read into the provisions of 10 O.S.1991 § 3. According to the dissent, Jimmy's petition states a claim for relief based on fraud because such an action is recognized by law. Further, the damages Jimmy seeks are not restitution of child support payments, as the majority asserts; rather, he merely uses the amount paid in child support as a measure of his legal damages. Finally, the dissent disagrees with the majority's reason for affirming the dismissal of Jimmy's cause of action for intentional infliction of emotional distress.

¶ 14 Jimmy sought and was granted certiorari.

## II

## STANDARD OF REVIEW

¶ 15 In reviewing a *nisi prius* disposition by dismissal, this court examines the issues de novo.[3] Motions to dismiss are generally viewed with disfavor.[4] The purpose of a motion to dismiss is to test the law that governs the claims, not the underlying facts.[5] According to Professor Fraser, a petition is sufficient under the Oklahoma Pleading Code if it discloses "the existence of the necessary elements of a legally recognized claim or cause of action."[6] A motion to dismiss for failure to state a claim upon which relief can be granted will not be sustained unless it should appear without doubt that the plaintiff can prove no set of facts in support of the claim for relief.[7] The court must take as true all of the challenged pleading's allegations together with all reasonable inferences which may be drawn from them.[8] A plaintiff is required neither to identify a specific theory of recovery nor to set out the correct remedy or relief to which he may be entitled.[9] If relief is possible under any set of facts which can be established and are consistent with the allegations, a motion to dismiss should be denied.[10] A petition can generally be dismissed only for lack of any cognizable legal theory or for insufficient facts under a cognizable legal theory.[11] This recapitulation of the standards for reviewing cases decided on motion to dismiss guides our review in this case.

## III

## THE PROVISIONS OF 10 O.S.1991 § 3 DO NOT REQUIRE DISMISSAL OF PLAINTIFF'S PETITION FOR FAILURE TO STATE A CLAIM

¶ 16 Defendants argue that the provisions of 10 O.S.1991 § 3[12] are a statute of

3. *Lockhart v. Loosen,* 1997 OK 103, ¶ 4, 943 P.2d 1074, 1077; *Washington v. State ex rel. Department of Corrections,* 1996 OK 139, ¶ 7, 915 P.2d 359, 361; *Indiana National Bank v. State Department of Human Services,* 1994 OK 98, ¶ 2, 880 P.2d 371, 375.

4. *Lockhart, supra* note 3, at ¶ 5, at 1078; *Indiana National Bank, supra* note 3, at ¶ 4, at 375; *Kentucky Central Life Insurance Company v. LeDuc,* 814 F.Supp. 832, 835 (N.D.Cal.1992).

5. *Zaharias v. Gammill,* 1992 OK 149, ¶ 6, 844 P.2d 137, 138.

6. George B. Fraser, *The Petition Under the New Pleading Code,* 38 OKLA. L.REV. 245, 246 (1985).

7. *A–Plus Janitorial & Carpet Cleaning v. The Employers' Workers' Compensation Association,* 1997 OK 37, ¶ 9, 936 P.2d 916, 922; *National Diversified Business Services, Inc. v. Corporate Financial Opportunities, Inc.,* 1997 OK 36, ¶ 9, 946 P.2d 662, 665; *Delbrel v. Doenges Bros. Ford,* 1996 OK 36, ¶ 3, 913 P.2d 1318, 1320; *Washington v. State, supra* note 3, at ¶ 7, at 361. The terms of 12 O.S.1991 § 2012(B) provide in pertinent part:
"Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion:
\* \* \*
6. Failure to state a claim upon which relief can be granted;
"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Groce v. Foster,* 1994 OK 88, ¶ 12, 880 P.2d 902, 906; *Dyke v. Saint Francis Hospital, Inc.,* 1993 OK 114, ¶ 7, 861 P.2d 295, 298; *Frazier v. Bryan Memorial Hosp. Authority,* 1989 OK 73, ¶ 13, 775 P.2d 281, 287. *See also* Committee Comment to 12 O.S.1991 § 2012(B), which observes that § 2012(B) is virtually the same as Federal Rule of Civil Procedure 12(b).

8. *Great Plains Federal Savings and Loan Association v. Dabney,* 1993 OK 4, ¶ 2, n. 3, 846 P.2d 1088, 1090, n. 3.

9. *Id.,* at ¶ 3, at 1096 (Opala, J., concurring).

10. *Lockhart, supra* note 3, at ¶ 4, at 1077; *Indiana National Bank, supra* note 3, at ¶ 4, at 376.

11. *Lockhart, supra* note 3, at ¶ 5, at 1078; *Indiana National Bank, supra* note 3, at ¶ 4, at 375; *Kentucky Central Life Insurance Company, supra* note 4, at 835.

12. The provisions of 10 O.S.1991 §§ 1 et seq. were amended in 1994. The change effected in Section 3 by the 1994 amendments does not affect either the status of plaintiff as legal father or the availability of Section 3 as a bar to the plaintiff's action. Prior to its amendment in 1994, Section 3 provided:
"The presumption of legitimacy can be disputed only by the husband or wife or the descen-

limitations which, when all its elements are met, sets up the presumption of legitimacy as a bar, not just to paternity actions or to actions in which the legal rights and responsibilities inherent in the legal status of paternity are contested, but also to any action where the issue of paternity is an element of proof.

¶ 17   Both in the trial court and on appeal, plaintiff engages the argument on defendants' terms.   He accepts defendants' contention that the statutory presumption of legitimacy is in dispute in his lawsuit, but argues that an exception to Section 3 should be recognized when the failure to dispute paternity in a timely fashion was caused by the other parties' fraud.   Plaintiff argues that the purposes of the presumption of legitimacy would not be served by having it afford protection to those who, like defendants, engaged in a fraud and then revealed their own fraudulent conduct.   At this juncture, plaintiff does not explicitly deny that his is a paternity action, but he implicitly identifies his claim as one of common law fraud by arguing that his claim should be governed by the statute of limitations for fraud, 12 O.S. Supp.1997 § 95(3),[13] and by the "discovery rule" applicable to fraud-based actions.

¶ 18   The majority of the Court of Civil Appeals accepted defendants' conceptualization of the case as one disputing paternity within the meaning of Section 3, rather than as a common law fraud action.   Holding that Section 3 admits of neither an explicit nor implicit exception for fraud, the majority affirmed the dismissal of Jimmy's petition. The dissent argued that whether or not Section 3 contains a fraud exception is irrelevant because Jimmy's suit is not a paternity action.   According to the dissent, the Section 3 time limitation is applicable only to a claim to establish or disestablish paternity, or one for related relief.   Plaintiff's action, the dissent urges, is a common law fraud action and is therefore governed not by the provisions of 10 O.S.1991 § 3, but by the statute of limitations found in 12 O.S. Supp.1997 § 95(3) and by the discovery rule[14].

¶ 19   In his brief on certiorari, plaintiff adopts the dissent's reasoning, arguing that he has not brought a paternity action and therefore the limitations period contained in the provisions of 10 O.S.1991 § 3 is inapplicable.   Plaintiff argues that his claim is for

---

dant of one or both of them.   Illegitimacy in such a case may be proved like any other fact. Provided that if the. child is born during the course of the marriage and is reared by the husband and wife as a member of their family without disputing the child's legitimacy for a period of at least two (2) years, the presumption cannot be disputed by anyone."

The presumption of legitimacy to which Section 3 refers is in the provisions of 10 O.S.1991 §§ 1 and 2:

"§ 1.   *Presumption of legitimacy*
All children born in wedlock are presumed to be legitimate."

"§ 2.   Children born after dissolution of marriage or before wedlock
All children of a woman who has been married, born within ten (10) months after the dissolution of the marriage are presumed to be legitimate children of that marriage.   A child born before wedlock becomes legitimate by the subsequent marriage of its parent."

These statutes were amended in 1994 and the amended versions were in effect at the time plaintiff's lawsuit was filed.   They remain operative today.   Subsection A. of Section 2 now states that with certain exceptions, "a man is presumed to be the natural father of a child for all intents and purposes" if any of five conditions obtain. Subsection B. of Section 2 provides that "the presumption of paternity created pursuant to this section may be disputed pursuant to Section 3...."   Section 3 now provides:
" § 3.   Persons entitled to dispute presumption—Time limit
    ....
B.   If a child is born during the course of the marriage and is reared by the husband and wife as a member of their family without disputing the child's legitimacy for a period of at least two (2) years, the presumption cannot be disputed by anyone.

**13.**   12 O.S. Supp.1997 § 95 Limitations of other actions

"Civil actions other than for the recovery of real property can only be brought within the following periods, after the cause of action shall have accrued, and not afterwards:
    ....
3.   Within two (2) years:   ... an action for relief on the ground of fraud—the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud; ..."

**14.**   The discovery rule allows limitations in tort cases to be tolled until the injured party knows or, in the exercise of reasonable diligence, should have known of the injury.   *Reynolds v. Porter,* 1988 OK 88, ¶ 6, n. 8, 760 P.2d 816, 820 n. 8.

various tortious acts perpetrated against him by defendants, and that he has alleged facts which would bring his action within the limitations period for those torts.[15] We agree.

■ ¶ 20 We have not previously considered whether the statutory presumption of legitimacy bars an action in which the plaintiff is not seeking to delegitimize a child, or to avoid the obligations of parenthood, but rather to obtain damages from an alleged tortfeasor for falsely representing that he is the father of the child. We hold that the provisions of 10 O.S.1991 § 3 cannot be invoked to defeat recovery for the kind of conduct alleged here. Were plaintiff asking the court to terminate his legal status as A's father, he would be barred by Section 3 from doing so. Plaintiff is not asking the court to do this. He is asking the court to consider the issue of his biological relationship to A, not to destroy his legal relationship. A judgment in his favor in this case will not sever his legal status to A nor alter the legal rights and obligations arising from the parent-child relationship. Plaintiff's biological connection to A is here merely the proof he needs to show that certain torts were perpetrated against him. Introducing evidence that he is not the biological father of A to prove that he was the victim of fraud or intentional infliction of emotional distress is not disputing paternity in the sense prohibited by the provisions of 10 O.S.1991 § 3.

¶ 21 The provisions of 10 O.S.1991 § 3 do not require dismissal of plaintiff's petition for failure to state a cause of action. It is therefore unnecessary to consider plaintiff's con-stitutional attack and estoppel argument with respect to the applicability of this statute.

## IV

## NEITHER CLAIM NOR ISSUE PRECLUSION IS A PROPER BASIS FOR DISMISSING PLAINTIFF'S ACTION

■ ¶ 22 Defendants interpose the divorce decree as a bar to the present case under the principle of res judicata. The term res judicata is often used imprecisely to denote two separate and distinct doctrines, known as res judicata or claim preclusion and collateral estoppel or issue preclusion.[16] These two doctrines are often used interchangeably because they are closely related and both promote the same general public policy concerns. Defendants fail to identify which of these doctrines they intend by the use of the term res judicata.

■ ¶ 23 Under the principle of claim preclusion, a final judgment on the merits of an action precludes the parties from relitigating not only the adjudicated claim, but also any theories or issues that were actually decided, or could have been decided, in that action.[17] The doctrine of claim preclusion is designed to prevent piecemeal litigation through the splitting of a single claim into separate lawsuits.[18] When claim preclusion is asserted, the court must analyze the claim involved in the prior action to ascertain whether it is in fact the same as that asserted in the subsequent action. Defining the term "claim" is the most difficult aspect of applying claim preclusion.[19] In *Retherford*, we defined claim as:

---

15. See note 13 for statutory limitations applicable to fraud. The statute of limitations for an action based on the tort of intentional infliction of emotional distress is also two years. See 12 O.S. Supp 1997 § 95(3); *Williams v. Lee Way Motor Freight, Inc.*, 1984 OK 64, ¶ 7, 688 P.2d 1294, 1297.

16. The Restatement of Judgments now speaks of res judicata as "claim preclusion" and collateral estoppel as "issue preclusion." RESTATEMENT OF JUDGMENTS (SECOND) § 74; *Allen v. McCurry*, 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

17. *National Diversified Business Services, Inc.*, supra note 7, at ¶ 12, at 667.

18. *Retherford v. Halliburton*, 1977 OK 178, 572 P.2d 966.

19. Allan D. Vestal, PERSONAL INJURY ANNUAL (1969) at V–43. Vestal describes a variety of analytical approaches to defining claim. While not advocating any single approach, he concludes:

"A mechanical definition of claim would seem to be less desirable than one which is derived from the policy considerations which underly (sic) the doctrine of res judicata/preclusion. Thus the purpose of the second suit and the reasonable expectations of the parties might well be considered important factors in defining 'claim'."

"a legal concept which has no separate existence in the natural order of things. It is what the makers of legal policy, the Legislature and the courts say it is. It exists to satisfy the needs of plaintiffs for a means of redress, of defendants for a conceptual context within which to defend an accusation, and of the courts for a framework within which to administer justice." [20]

¶ 24 Considering in light of this definition the claim pressed in the divorce action and that advanced in this tort case, we conclude that the two lawsuits do not tender the same claim. A civil action in tort is fundamentally different from a divorce proceeding. The purpose of a tort action is to establish liability for a legal wrong and to recover damages. The purpose of a divorce action is to end the marital relationship of a husband and wife, to determine the parties' rights and responsibilities to each other and to any children, and to divide marital assets. The divorce action did not involve any allegation of tortious behavior of the kind asserted here. The two actions being distinct, claim preclusion is not invocable.

¶ 25 The other preclusion doctrine, which sometimes imprecisely goes under the name res judicata, is issue preclusion. Under the doctrine of issue preclusion,[21] once a court has decided an issue of fact or of law necessary to its judgment, the same parties or their privies *may not relitigate that issue* in a suit brought upon a different claim.[22]

The purpose of issue preclusion is to "relieve the parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and by preventing inconsistent decisions, encourage reliance on adjudication." [23]

¶ 26 Issue preclusion may apply when the party to be precluded has had an opportunity and incentive to litigate a particular issue and has lost on that issue.[24] The defendant must show that the issue sought to be precluded was actually litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior action. Defendants argue that this is true in this case with respect to the issue of paternity. We disagree. The issue of paternity, as settled in the divorce action, is not identical to the issue of paternity which is raised by the allegations in the present case.[25] The determination of paternity in a divorce case identifies that male whom the law and society will hold responsible for carrying out the duties of a father toward a child, including the duty of providing financial support. It also identifies the male *who* will have rights with respect to the child, including the right to visitation, and determines mutual rights, such as the right of inheritance.

¶ 27 Plaintiff in the present case is not disputing paternity as it relates to any of the rights and responsibilities established between him and A. Rather, in this tort action,

---

**20.** *Retherford, supra* note 18, at ¶ 9, at 968.

**21.** The use of the more descriptive term issue preclusion was advanced in the works of Professor Allan D.Vestal, *Res Judicata/Preclusion,* PERSONAL INJURY ANNUAL (1969); *Res Judicata/Preclusion: Expansion,* 47 S. CAL. L. REV. 357 (1974); *State Court Judgment as Preclusive in Section 1983 Litigation in a Federal Court,* 27 OKLA. L. REV. 185 (1974), *adopted by* RESTATEMENT OF JUDGMENTS (SECOND) § 27, Comment b (1982); *Underside v. Lathrop,* 1982 OK 57, ¶ 6, n. 8, 645 P.2d 514, 517, n. 8; *Veiser v. Armstrong,* 1984 OK 61, ¶ 8, n. 7, 688 P.2d 796, 799, n. 7.

**22.** *Allen v. McCurry, supra* note 16, at 449 U.S. 94, 101 S.Ct. at 414; *National Diversified Business Services, Inc., supra* note 7, at ¶ 11, at 666; *Chambers v. City of Ada,* 1995 OK 24, ¶ 9, n. 5, 894 P.2d 1068, 1072, n. 5; *Wilson v. Kane,* 1993 OK 65, ¶ 8, n. 23, 852 P.2d 717, 722, n. 23; *Veiser, supra* note 21, at ¶ 8, n. 9, at 800, n. 9;

*See also, Robinson v. Volkswagenwerk AG,* 56 F.3d 1268, 1272 (10th Cir.1995); RESTATEMENT OF JUDGMENTS (SECOND) § 27 (1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.").

**23.** *Allen, supra* note 16, 449 U.S. at 94, 101 S.Ct. at 414.

**24.** VESTAL, *State Court Judgment as Preclusive in Section 1983 Litigation in a Federal Court, supra* note 21, at 187.

**25.** We attribute to the 1994 amendments discussed in note 12, *supra,* no legal change that would affect our discussion of claim or issue preclusion.

plaintiff's biological nexus to A is the sole issue. *The relief plaintiff seeks is not a change of legal status, but damages in tort.* A judgment establishing the legal status of paternity in a divorce proceeding may not be invoked to bar a determination of biological paternity in a tort action based upon the kind of fraudulent conduct alleged here.

¶ 28   Even if the issues in the former and present action were identical, we would not permit preclusion doctrine to be invoked in this case.   Issue preclusion is not applied mechanistically.   It may only be invoked if the party against whom the earlier decision is interposed had a "full and fair opportunity" to litigate the critical issue in the previous case.[26]   This condition for applying issue preclusion is an important safeguard in the fair administration of preclusion doctrine.[27]   The circumstances to which consideration should be given in determining whether a party has had a full and fair opportunity to litigate an issue in a prior action are set forth in the Restatement of Judgments (Second) at Section 28, which states:

> "Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
>
> . . .
>
> (5) There is a clear and convincing need for a new determination of the issue . . . (b) because it was not sufficiently foreseeable at the time of the initial action that the issue would arise in the context of a subsequent action, or (c) because the party

sought to be precluded, as a result of the conduct of his adversary or other special circumstances, did not have an adequate opportunity or incentive to obtain a full and fair adjudication in the initial action."

¶ 29   Taking plaintiff's allegations as true, as we must for purposes of this appeal, it is painfully obvious that plaintiff has never had a meaningful opportunity to litigate any aspect of paternity, legal or biological.   The defendants' fraudulent conduct during the first two years of A's life effectively foreclosed the possibility that plaintiff could dispute in a timely fashion his legal status as A's father.[28]   Moreover, at the time of the divorce proceeding, plaintiff had no reason to foresee that his paternity would become an issue in the context of the present action.   In no way can it be said that the plaintiff has had a full and fair opportunity to litigate the issue of biological paternity.

¶ 30   This court has recently held that the availability of new evidence can be considered in determining whether a litigant has had a full and fair opportunity to litigate an issue in a prior action for purposes of applying preclusion doctrine.[29]   Plaintiff in this case had no evidence before or at the time of the divorce action, or for that matter up until 1996, which should have put him on notice that he was not A's biological father.   That evidence was only discovered by plaintiff long after the divorce proceeding was history.   For this reason, too, defendants are barred in this case from invoking preclusion doctrine.

¶ 31   Authorities cited by defendants in their brief on certiorari differ significantly in their factual circumstances from the present case and are therefore unpersuasive.[30]

---

**26.** *National Diversified Business Services, Inc.,* *supra* note 7, at ¶ 11, at 667; *Fent v. ONG,* 1994 OK 108, ¶ 15, 898 P.2d 126, 133; *Underside,* *supra* note 21, at ¶ 6, n. 6, at 516, n. 6; *Veiser,* *supra* note 21, ¶ 16, n. 21, at 800, n. 21.

**27.** *Blonder–Tongue Labs., Inc., v. University of Illinois Foundation,* 402 U.S. 313, 329, 91 S.Ct. 1434, 1443, 28 L.Ed.2d 788 (1971) (Because " . . . neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most signifi-

cant safeguard."); *Danner v. Dillard Department Stores, Inc.,* 1997 OK 144, ¶ 9, 949 P.2d 680.

**28.** In a claim of non-paternity raised on or before the date of the divorce, the provisions of 10 O.S.1981 § 3 would have been applicable.

**29.** *Danner, supra* note 27, at ¶ 9, at 682. *See also, Schwartz v. Public Adm'r of Bronx County,* 24 N.Y.2d 65, 298 N.Y.S.2d 955, 960, 246 N.E.2d 725, 729 (1969).

**30.** *Arnold v. Arnold,* 207 Okl. 352, 249 P.2d 734 (1952) (a man attempted to set aside a finding of

## V

## PLAINTIFF'S PETITION STATES A CLAIM BASED ON THE THEORY OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

¶ 32 The tort of intentional infliction of emotional distress was not known to the common law [31] and was not readily embraced as a distinct grounds of recovery until well into this century. As late as 1934, the Restatement of Torts rejected emotional distress as a separate basis for liability, saying, "conduct which is intended or which though not so intended is likely to cause only a mental or emotional disturbance to another does not subject the actor to liability for emotional distress resulting therefrom." [32] The primary objections to the

adoption of this tort were, and still remain, the difficulty of proving causation, the danger of fraudulent claims, and the fear of a flood of litigation. [33] Although they refused to grant formal recognition to recovery for mental suffering, courts nevertheless found ways of providing recourse for truly serious injuries to feelings and emotions, displaying, according to one commentator at the time, "a notable adaptability of technique in redressing the more serious invasions of this important interest of personality." [34] Damages for emotional distress were often assessed as an adjunct or "parasitic" augmentation to traditional torts or predicated on a breach of contract theory. [35] Prosser strongly criticized the continued resort to subterfuge in cases involving emotional distress and advocated acknowledging the real basis

paternity in a divorce decree in a subsequent action to determine child support on the grounds that he was not the child's father. The court dismissed the complaint as an attempt to vacate a judgment on the grounds of fraud after the limitations period for vacating a judgment had expired); *Cain v. Meredith*, 1994 OK CIV APP 116, 884 P.2d 860 (application of claim preclusion to bar a second paternity action brought by a child after a judgment of non-paternity had already been obtained in an earlier paternity action brought by the mother of the child); *Copeland v. Anderson*, 1985 OK CIV APP 30, 707 P.2d 560 (*overruled on other grounds by Cooper v. Parker–Hughey*, 1995 OK 35, 894 P.2d 1096) (a former wife brought an action against her former husband to vacate or modify a prior divorce decree. The Court of Civil Appeals stated that plaintiff's action to vacate or modify a prior judgement appeared to be founded on the fourth ground listed in 12 O.S.1981 §§ 1031, which provides for vacation of a judgment for fraud practiced by the successful party in obtaining the judgment. The appellate court held that plaintiff's petition failed to comply with the requirements of Title 12 O.S.1981 §§ 1031 et seq. and therefore failed to state a cause of action. The Court of Civil Appeals also discussed the applicability of res judicata and stated that the doctrine would apply because the *sine qua non* of plaintiff's action was identical in both cases and, moreover, the former wife had failed to utilize pre-trial discovery procedures after she had reason to be suspicious of her former husband's potential business venture. While not specifically considering and rejecting the use of the "full and fair opportunity to litigate" exception to preclusion doctrine, the Court of Civil Appeals in *Copeland* said the plaintiff "could have, and certainly should have, garnered the evidence in advance of trial and presented it in court.")

**31.** The common law view of recovery for emotional distress was stated in Leigh v. Knight, 9 H.L. Cas. 577, 598, 11 Eng. Rpts. 854, 863 (1861) ("Mental pain or anxiety the law cannot value, and does not redress, when the unlawful act complained of causes that alone."). A form of intentional infliction of emotional distress was known in ancient Roman law as the delict of *iniuria*, which provided for recovery for a wilful act which attacked a person or a person's honor. The essence of the action was the wrongful insult to the person or his feelings and it was said that the action was one *"vindictam spirans"* (breathing revenge) to show that the victim's reaction to the wrong was serious enough to want revenge. P. Van Warmelo, An Introduction to the Principles of Roman Civil Law, 220–222 (1976).

**32.** Restatement of the Law of Torts § 46 (1934).

**33.** *Kazatsky v. King David Memorial Park, Inc.*, 515 Pa. 183, 192, 527 A.2d 988, 992 (1987); *Howell v. New York Post Company, Inc.*, 81 N.Y.2d 115, 120, 612 N.E.2d 699, 701, 596 N.Y.S.2d 350, 352 (1993); Prosser and Keeton, Handbook of the Law of Torts, at 55–56 (1984).

**34.** Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv.L.Rev. 1033, 1067 (1936).

**35.** *Howell v. New York Post Company, Inc., supra* note 33, 612 N.E.2d at 701, 596 N.Y.S.2d at 352; *Magruder, supra* note 34, at 1048 ("Such redress as the law affords for its invasion is "parasitic" upon a cause of action for the violation of some other recognized legal right.").

of the action,[36] facetiously suggesting the rather unorthodox name of "orneriness" for the new tort.[37] In response to such criticism and in light of the evolving case law cited by academic critics of its earlier position, the American Law Institute announced in 1948 its approval of a new tort which would impose liability upon "one who, without a privilege to do so, intentionally causes severe emotional distress to another." [38] The limitless scope of this formulation soon became apparent, and in the Restatement of Torts (Second), the tort was refashioned into its present form which limits recovery to those cases in which the conduct causing the emotional distress is extreme and outrageous.[39] The tort of intentional infliction of emotional distress has now been adopted in almost every state,[40] and the vast majority of those states have adopted the Restatement formulation.[41]

¶ 33  In *Breeden v. League Services Corp.*,[42] this court delineated the scope of the tort of intentional infliction of emotional distress for Oklahoma jurisprudence by adopting the narrow standards of § 46 of the Restatement of Torts (Second) (1977). An action for intentional infliction of emotional distress will lie only where there is extreme and outrageous conduct coupled with severe emotional distress.[43] Intentional infliction of emotional distress does not provide redress for every invasion of emotional serenity or every anti-social act, and it does not protect mere hurt feelings, no matter how justified.[44]

36. William L. Prosser, *Intentional Infliction of Mental Suffering: A New Tort*, 37 Mich. L.Rev. 874, 886–887 (1939) ("Out of the array of technical assaults, batteries, imprisonments, trespasses, 'implied contracts,' invasions of 'privacy,' or of doubtful 'property rights,' the real interest which is being protected stands forth very clearly.").

37. *Id.* at 874 ("Of course there is no necessity whatever that there should be separate torts, or that a tort must have a name; (footnote omitted) but if a name must be found for this one, we might do worse than to borrow a word from the vernacular of Kentucky and points south, and call it 'orneriness' ").

38. Restatement of Torts, § 46[a] (1948 Supp.). Commentators have noted that the Restatement did not actually "restate" the law so much as act as midwife to its creation:

"Although it relies on prior cases, the Restatement in this area has generated the law more than it has restated it." William H. Theis, *The Intentional Infliction of Emotional Distress: A Need for Limits on Liability*, 27 DePaul L.Rev. 275, 276 (1977); "Academics, rather than courts, were the prime movers in the development of the tort of intentional infliction of severe emotional distress by outrageous conduct; the modern tort was introduced in the pages of law reviews (footnote omitted), and then refined and finally defined by the American Law Institute in its Restatements (footnote omitted)." Daniel Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct*, 82 Colum. L.Rev. 42 (1982); "It is interesting to note that this tort is not truly a judicial development simply 'restated' by the American Law Institute. *Kazatsky v. King David Memorial Park*, *supra* note 33, 527 A.2d at 993–994, n. 5.

39. Restatement of the Law of Torts (Second), § 46(1) (1965) states: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, ..."

40. *See*, *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993) for collected cases. As of 1993, forty-six states had recognized an action for damages for emotional distress.

41. *Id.* As of 1993, forty-three of the forty-six states recognizing the tort of intentional infliction of emotional distress had also adopted the Restatement of the Law of Torts (Second) formulation of the tort.

42. 1978 OK 27, 575 P.2d 1374. Oklahoma recognized an early precursor to intentional infliction of emotional distress in *Mashunkashey v. Mashunkashey*, 189 Okl. 60, 113 P.2d 190 (1941), an action for fraud in inducing plaintiff into a bigamous marriage. In that case, the court held that "mental pain and suffering may constitute the basis of an independent action in cases of wilful wrong of the character where mental suffering is recognized as the ordinary, natural and proximate result of such wrong." In *Dean v. Chapman*, 1976 OK 153, 556 P.2d 257, the court moved in the direction of the Restatement (Second) definition of intentional infliction of emotional distress by adopting the language of Comment d to § 46 of the Restatement (Second) of Torts to describe the type of "willful wrong" generally recognized to ordinarily and naturally result in mental suffering.

43. *Brock v. Thompson*, 1997 OK 127, ¶ 35, 948 P.2d 279, 293–94.

44. *Eddy v. Brown*, 1986 OK 3, ¶ 7, 715 P.2d 74, 77. It is only where the emotional reaction is

Liability does not extend "to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.[45] The test is whether the alleged tortfeasor's conduct is simply one of those unpleasant examples of human behavior which we all must endure from time to time, or whether it has so totally and completely exceeded the bounds of acceptable social interaction that the law must provide redress.[46] This court has agreed that the line between the acceptable and the unacceptable should be drawn in accordance with Comment d to § 46 of the Restatement (Second):

> "... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' ..."[47]

¶ 34 It is the trial court's responsibility initially to act as gatekeeper: to determine whether the defendant's conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the § 46 standards. Only when it is found that reasonable people would differ in an assessment of this central issue may the tort of intentional infliction of emotional distress be submitted to the jury.[48]

¶ 35 The trial court did not specifically address in this case the issue of the outrageousness of defendants' conduct when it dismissed plaintiff's action for failure to state a claim. The parties' briefs below were limited to arguments addressing the statutory and preclusion bar and did not discuss outrageousness or any other aspect of the tort of intentional infliction of emotional distress.[49] The Court of Civil Appeals upheld the trial court's dismissal of Jimmy's theory of intentional infliction of emotional distress, not based on the provisions of 10 O.S.1991 § 3 or preclusion doctrine, but rather because, in its view, the defendants' conduct failed to cross the threshold degree of outra-

extreme that liability attaches. "Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." RESTATEMENT OF THE LAW OF TORTS (SECOND) § 46, Comment j (1965).

45. *Id.* at ¶ 7, at 77 ("The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind....")

46. In practice, this simple test has generated great controversy. *See, e.g.,Twyman, supra* note 40:

"Proving that conduct is or is not outrageous is virtually impossible....The issue is certainly not a factual one, like whether the traffic light was red or green, on which a witness can be called to testify. It is a matter of opinion, ... Whether a judge or a jury decides the issue of outrageousness, neither has a standard for doing so. Without evidence or rules to guide a decision, both can resort only to their own views, and their own prejudices.... Ordinarily the law forbids factfinders from relying upon

personal prejudices in deciding a case, but with this tort there is no alternative." *Id.* at 631–633 (Hecht, J., concurring and dissenting).

*See also, Kazatsky v. King David Memorial Park, Inc., supra* note 33 ("The species of tort created (footnote omitted) by section 46 provides only the most nebulous definition of 'outrageous' conduct. This in turn renders the cause of action one which tends to defy principled adjudication."). *Id.* at 993–994.

*See also,* Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct, supra* note 38.

47. *Breeden v. League Services Corp., Inc., supra* note 42.

48. *Eddy v. Brown, supra* note 44, at ¶ 6, at 76–77; *Breeden v. League Services Corp., supra* note 42, at ¶ 12, at 1377. This two-tiered adjudication process conforms to the procedure outlined in the RESTATEMENT OF THE LAW OF TORTS (SECOND), at § 46 h and j (1965).

49. If the trial court's rejection of the plaintiff's theory of intentional infliction of emotional distress was based on the provisions of 10 O.S.1991 § 3 and /or res judicata, its conclusion was mistaken. *See supra* our discussion of these two arguments.

geousness necessary to proceed with this tort. We disagree and hold that plaintiff has stated sufficient facts upon which reasonable people could conclude that defendants' conduct was indeed extreme and outrageous.

¶ 36 The Court of Civil Appeals described the behavior complained of as "confessing a fifteen year lie and revealing the identity of ... [A's] biological father." This rather cold and lifeless characterization of defendants' conduct fails to take into account much of what plaintiff alleges, including (1) the telling of a premarital falsehood going to the heart of the marital and parental relationship, a falsehood which was implicitly repeated every day until the defendants decided the falsehood was no longer useful to them, (2) causing the plaintiff to develop a parental relationship with a child, believing that child to be his biological offspring, and then causing plaintiff to learn that the child was not biologically his own, (3) using the plaintiff to fulfill the emotional, physical, and financial obligations of a husband for almost five years and of a father for fifteen years, knowing that these obligations were not really his, (4) undermining the plaintiff's relationship to his child, first by gratuitously revealing to the child that plaintiff, the man she knew as her father, was not in fact biologically related to her, and then by attempting to establish and foster a parental relationship between the child and another man whom the defendants identified as A's "real father", and his family, (5) failing to reveal the truth to the plaintiff in the divorce action, resulting in plaintiff joining in a legal document acknowledging his parental relationship to A, (6) failing to reveal the truth to the court in the divorce action, thereby showing contempt for the judicial system and making the divorce court an unwitting accomplice to fraud, (7) causing the plaintiff to suffer from the knowledge that he had been hoodwinked and used, and

(8) boasting that nothing could be done about their fraud.

¶ 37 Whether plaintiff can prove these allegations, as well as prove the other elements of the tort [50] and whether a jury would in fact find such conduct extreme and outrageous are questions about which we express no opinion. We need only consider whether the allegations of defendants' conduct may reasonably be regarded as sufficiently extreme and outrageous to meet the § 46 standards. We believe they may reasonably be so regarded. That rational people might differ as to whether plaintiff's allegations may reasonably be regarded as outrageous is demonstrated by the split decision in this case by the Court of Civil Appeals. Where reasonable people may differ on this issue, the threshold has been crossed and dismissal is improper.

## VI

## PLAINTIFF STATES A CLAIM FOR FRAUDULENT INDUCEMENT TO MARRY

¶ 38 An action for damages for fraudulent inducement to marry has been recognized in Oklahoma with respect to both void and valid marriages.[51] Like other fraud-based actions, a claim for fraudulent inducement to marry must allege all the elements of common law fraud. These are: 1) a false material representation, 2) made as a positive assertion which is either known to be false, or made recklessly without knowledge of the truth, 3) with the intention that it be acted upon, and 4) which is relied upon by a party to that party's detriment.[52] The requirement that the false representation be material is easily met where the person misrepresents that he or she has the capacity to marry when in fact he or she lacks such capacity, as in the case of bigamy. We have

---

**50.** In order to recover for intentional infliction of emotional distress, plaintiff must prove, in addition to extreme and outrageous conduct by defendants, that they acted intentionally or recklessly and that he has in fact suffered severe emotional distress. For a discussion of cases involving variations on this fact pattern, see Leonard Karp and Cheryl L. Karp, *Beyond the Normal Ebb and Flow ... Infliction of Emotional*

*Distress in Domestic Violence Cases*, 28 Family Law Quarterly 389, 403–404.

**51.** *Tice v. Tice*, 1983 OK 108, 672 P.2d 1168; *Whitney v. Whitney*, 194 Okl. 361, 151 P.2d 583 (1944); *Mashunkashey, supra* note 42.

**52.** *Gay v. Akin*, 1988 OK 150, ¶ 7, 766 P.2d 985, 989.

held in that circumstance that the marriage is void and that the injured party can have the marriage annulled or can seek a divorce and damages for fraud.[53]

¶ 39 The only case decided by this court in which a party has alleged fraudulent inducement into a valid marriage is *Tice v. Tice*,[54] in which we held that a husband's alleged breach of a prenuptial oral promise to reimburse any lost alimony which the wife would have received under a previous divorce decree had she not remarried entitled the wife to recover damages to compensate her for the lost alimony. The court stated that insofar as property interests are concerned, marriage is founded on business principles, and marital fraud affecting a plaintiff's property interests should be treated no differently than fraud in any other context. While the court in *Tice* did not explicitly discuss the materiality of the fraudulent promise in that case, implicit in its holding is the principle that a misrepresentation affecting property interests which induces a party to marry can be a material misrepresentation. This court has never had occasion to consider the materiality of a misrepresentation made to induce a party to enter into a valid marriage, which affects an interest other than a party's property interest. The present case presents this issue.

■ ¶ 40 We hold that a misrepresentation inducing one to enter into a valid marriage must go to the essential ingredients of the marriage in order to sustain a finding of materiality sufficient to support a cause of action for fraudulent inducement to marry. This is a necessary restriction. Every premarital representation of boundless affection, eternal love, and endless commitment cannot be allowed to give rise to an action for fraud when a marriage breaks down, and love and commitment prove unenduring. Limiting materiality to those representations which go to the essence of the marital relationship will avoid misuse of the judicial system to avenge hurt feelings and disappointed dreams.

■ ¶ 41 The question here is whether the defendants' misrepresentation concerning plaintiff's paternity is material. Does it go to the essence of the marital relationship? In this regard, it is useful to consider those cases in which an annulment has been granted based upon a claim of fraudulent inducement to marry. These cases are instructive because they deal with whether a fraud is sufficiently material to vitiate the marriage contract. If a claim of fraud is sufficient to support an annulment, then it ought to be sufficient to support an action for damages where an annulment is unavailable because the marriage has already been dissolved by divorce.[55]

¶ 42 Misrepresentations which have been found to go to the essence of the marital relationship, generally in an action for annulment, include concealment of the fact that one party was suffering from syphilis,[56] concealment by the husband that he lacked the physical and mental capacity to engage in normal sexual relations with his wife,[57] concealment of the fact that one party married the other for the sole purpose of obtaining a "green card" from the Immigration Department,[58] concealment of a former narcotics addiction and a prior criminal record,[59] concealment of heroin addiction,[60] and concealment of a criminal record and a false representation that joint funds were being used

53. *Whitney, supra* note 51.

54. *Tice, supra* note 51. For a discussion of cases where the fraudulent inducement to marry invades the plaintiff's economic interest, see Robert G. Spector, *All in the Family—Tort Litigation Comes of Age*, 28 Family Law Quarterly 363, 371–374 (1994); Robert G. Spector, *Fraudulent Inducement Into Marriage: Still Tortious After All These Years*, 12 No. 3 FairShare 8 (March 1992).

55. *Charley v. Fant*, 892 S.W.2d 811 (Mo.App. 1995).

56. *Watson v. Watson*, 143 S.W.2d 349 (Mo.App. 1940).

57. *Kshaiboon v. Kshaiboon*, 652 S.W.2d 219 (Mo. App.1983).

58. *Rabie v. Rabie*, 40 Cal.App.3d 917, 115 Cal. Rptr. 594 (Cal.App.1974).

59. *Lockwood v. Lockwood*, 29 Misc.2d 114, 220 N.Y.S.2d 718 (Sup.Ct.1961).

60. *Costello v. Porzelt*, 116 N.J.Super. 380, 282 A.2d 432 (1971).

for child support when they were really being used to pay fines and restitution.[61]

¶ 43  Misrepresentations which have been found not to be essential to the purposes of the marriage relationship include: misrepresentation of affection,[62] concealment of lesbian activities and drug use prior to marriage,[63] concealment of prior marriage and divorce,[64] concealment of the fact that inheriting the property of the spouse at death was the motive for the marriage,[65] and concealment of a misdemeanor narcotics conviction coupled with a periodic, but not consistent, disabling narcotics addiction.[66]

¶ 44  Cases involving misrepresentations of pregnancy fall into two categories.  One category consists of a false claim of a pregnancy which the woman knows does not in fact exist.  Relief has been denied under these circumstances on the ground that a false representation of pregnancy does not go to the essence of the marital relationship because it does not prevent the future performance of the marital obligation to bear only the children of the spouse.[67]  The other category consists of a true claim of an existing pregnancy coupled with a false representation that the prospective spouse is the child's father when in fact the father of the child is known or suspected to be another man.  The majority of cases, especially those decided since the turn of the century, have held that such fraud goes to the essence of the marital relationship and vitiates the marriage contract.[68]

¶ 45  We hold that a true claim of an existing pregnancy coupled with a false representation that the child is that of the prospective spouse goes to the essentials of the marital relationship and will support an action based on fraud.[69]

## VII

## PLAINTIFF IS NOT ENTITLED TO RESTITUTION OF MONEY PAID PURSUANT TO A VALID CHILD SUPPORT ORDER

■  ¶ 46  Plaintiff labels his third theory of recovery "quantum meruit."  Liberally construing his pleadings, we understand him to be asking for restitution of payments for A's support because the child support order contained in the divorce decree was obtained by Judy's fraudulent misrepresentation to the divorce court that Jimmy was A's father.  According to Jimmy, Judy was unjustly en-

61.  *Haacke v. Glenn*, 814 P.2d 1157 (Utah App. 1991).  Haacke contains an extensive list of cases from other jurisdictions which have found misrepresentations which go to the essential purpose of the marriage.

62.  *Nebbitt v. Nebbitt*, 589 S.W.2d 297 (Mo.1979)

63.  *Woy v. Woy*, 737 S.W.2d 769 (Mo.App.1987).

64.  *Charley*, supra note 55.

65.  *Henderson v. Ressor*, 141 Mo.App. 540, 126 S.W. 203 (1910).

66.  *Husband v. Wife*, 257 A.2d 765 (Del.Super.Ct.1969).

67.  *Hill v. Hill*, 79 Ill.App.3d 809, 35 Ill.Dec. 98, 398 N.E.2d 1048 (1979); *Husband v. Wife*, 262 A.2d 656, 657–658 (Del.Super.Ct.1970).  Relief has also been denied on the theory of *pari delicto*, i.e. having engaged in premarital intercourse, the man has created his own mess and should not expect the courts to clean it up.  *Mobley v. Mobley*, 245 Ala. 90, 16 So.2d 5 (1943).

68.  *Sissung v. Sissung*, 65 Mich. 168, 31 N.W. 770, 773 (1887) ("The essence of the marriage contract is absent when a woman, at the time of its consummation, is bearing in her womb, knowingly, the fruit of her illicit intercourse with a stranger, . . ."); *Winner v. Winner*, 171 Wis. 413, 177 N.W. 680, 682 (1920) (". . . the concealment by the woman of the paternity of her child is a fault so grievous that there is no excuse or palliation for it.  By the fraud she foists upon her husband a spurious offspring which he must acknowledge as his knowing it not to be.  He must nurture and maintain it and invest it with all the rights of legitimate children, including that of inheritance.  Such a fraud is vital, and goes to the essentials of the marriage relationship."); *Arndt v. Arndt*, 336 Ill.App. 65, 82 N.E.2d 908 (1948) *Eck v. Eck*, 793 S.W.2d 858 (Ky.App.1990); Annotation, *Right to annulment of marriage induced by false claim that husband was cause of existing pregnancy*, 11 A.L.R. 931.  Some courts have adhered to the *pari delicto* theory under these circumstances and denied recovery.

69.  Generally, the cases involve requests for an annulment when the fraud is discovered.  Where, as here, annulment is not available, the fraud is compensable in an action for damages.

riched by the receipt of the child support and may be compelled by equity to return it to him.

¶ 47 The general rule is that there can be no restitution of benefits conferred pursuant to a valid, unreversed judgment as long as the judgment stands.[70] If, as here, the time has expired for vacating a judgment allegedly obtained by fraud,[71] the aggrieved party may bring an independent suit in equity to have the judgment annulled and the property or money transferred pursuant to the judgment returned, but only if the vacation claim is predicated on extrinsic fraud.[72] In order to prevail, plaintiff must allege with particularity the material facts constituting the extrinsic fraud authorizing equity to annul the judgment.[73]

¶ 48 Extrinsic fraud differs from intrinsic fraud.[74] The former consists of (a) any fraudulent conduct of a successful party (b) which was practiced outside of an actual adversary trial or process and (c) which was practiced directly and affirmatively on the defeated party, (d) whereby he was prevented from presenting fully and fairly his side of the case.[75]

¶ 49 Plaintiff's petition fails to allege facts constituting extrinsic fraud.

Judy's representation in the divorce proceeding that plaintiff was the father of A, if false,[76] constitutes only intrinsic fraud. Perjured testimony constitutes intrinsic fraud.[77] The remaining acts of fraud which plaintiff alleges, the original premarital fraud and the ongoing misrepresentation of paternity prior to the divorce, were not perpetrated by Judy *in the procurement of the support order* and therefore, do not constitute the kind of fraud which will warrant the intervention of equity to order vacation of a judgment and restitution. Plaintiff's third theory of recovery was correctly rejected.

## SUMMARY

¶ 50 Plaintiff's petition sought recovery under the theories of fraud, quantum meruit, and intentional infliction of emotional distress. All of these theories were rejected by the trial court for failure to state a claim, and the dismissal was affirmed by the Court of Civil Appeals. Having reviewed the pleadings *de novo*—as it must—this court holds that plaintiff's petition states a claim based on the theories of fraud and intentional infliction of emotional distress, and plaintiff is entitled to proceed for relief on these grounds. Plaintiff's theory of "quantum me-

70. *Terrell v. Gotcher*, 197 Okl. 650, 174 P.2d 229, 230 (1946); Restatement, Restitution, § 72 (1936); Graham Douthwaite, Attorney's Guide to Restitution, § 3.4 (1977).

71. Title 12 O.S.1991 § 1031(4) provides for the vacation or modification of a judgment for fraud practiced by the successful party in obtaining it. Title 12 O.S. Supp.1997 § 1038 requires proceedings to vacate or modify a judgment for fraud in its procurement to be commenced within two (2) years after the filing of the judgment.

72. *Chapman v. Chapman*, 1984 OK 89, ¶ 8, 692 P.2d 1369, 1372.

73. *Id.*

74. An independent suit in equity, by which a collateral attack is launched on a judgment will not lie for relief from intrinsic fraud, but only from extrinsic fraud. Relief from the former must be by direct attack in the same case in which the fraud was committed. Intrinsic fraud is "... any fraudulent conduct of the successful party which was practiced during the course of an actual adversary trial of the issues joined and which had no effect directly and affirmatively to

mislead the defeated party to his injury after he announced that he was ready to proceed with the trial. If during the trial the successful party urges forged instruments or perjured testimony or fails to introduce witnesses of whom he had knowledge and whose testimony would help his adversary and impair his own case he is guilty of fraud, but it is intrinsic fraud, for relief from which application must be made to the court having jurisdiction of the issues joined and tried.'" *Calkin v. Wolcott*, 182 Okl. 278, 77 P.2d 96, 100 (1938); *Phillips v. Ball*, 358 P.2d 193, 197 (1961).

75. *Calkin v. Wolcott*, *supra* note 74, 77 P.2d at 100; *Phillips v. Ball*, *supra* note 74.

76. At the time Judy made the representation to the divorce court, Jimmy was already statutorily presumed to be A's legal father. Therefore, it cannot be said that her statement in the context of the divorce proceeding was technically false.

77. *See* note 74. *Contra*, perjury which goes to the court's jurisdiction is considered extrinsic. *State v. Oklahoma City*, 1973 OK 134, ¶ 27, 522 P.2d 612, 618–619.

ruit" or unjust enrichment was correctly deemed inappropriate.

¶51 ON CERTIORARI GRANTED UPON THE PLAINTIFF'S PETITION, COURT OF CIVIL APPEALS' OPINION IS VACATED; TRIAL COURT'S ORDER OF DISMISSAL REVERSED IN PART AND AFFIRMED IN PART, AND THE CAUSE IS REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS PRONOUNCEMENT.

¶52 KAUGER, C.J., SUMMERS, V.C.J., and HODGES, LAVENDER, ALMA WILSON and WATT, JJ., concur.

¶53 SIMMS and HARGRAVE, JJ., dissent.

SIMMS, Justice, dissenting:

¶1 In my opinion the trial court correctly dismissed all plaintiff's claims for failure to state a cause of action and the Court of Appeals correctly affirmed that judgment. I would not have granted certiorari and I dissent to that portion of the majority's opinion reversing the trial court's judgment. In addition to it's other failings, this "action" is merely a poorly disguised effort by plaintiff to do indirectly what he could not do directly since his paternity of this child is irrebuttable and conclusive. Title 10, O.S.1991, §§ 2, 3. See, e.g., *David V.R. v. Wanda J.D.*, 1995 OK 111, 907 P.2d 1025 (1995).

¶2 I am authorized to state that Justice HARGRAVE joins in the views expressed herein.